Jacksonville Bus Line Company, Plaintiff-Appellant,
v. Herbert Watson, Defendant-Appellee.

Gen. No. 9,758.

Opinion filed May 31, 1951. Rehearing denied September 4, 1951. Released for publication September 4, 1951.

JENKINS, OLSEN & CANTRILL, of Springfield, for appellant.

MANUEL M. WISEMAN, IRVING M. WISEMAN, and HARRY R. MONDHINK, all of Alton, and JAMES O. MONROE, of Collinsville, for appellee.

MR. JUSTICE DADY delivered the opinion of the court.

This is an appeal from a decree of the circuit court of Greene county denying a writ of injunction sought by plaintiff-appellant, Jacksonville Bus Line Company, a corporation, to restrain defendant-appellee, Herbert Watson, from conducting bus operations between Roodhouse and East Alton on U. S. Route 67.

The chancellor heard the evidence and thereupon entered the decree appealed from.

The sufficiency of the pleadings is not questioned.

At all times in question plaintiff was authorized to transact and was doing business as a common carrier of passengers by virtue of Certificates of Public Convenience and Necessity issued by the Illinois Commerce Commission, on regular routes for compensation, including Route 67 between Jacksonville and East Alton, serving Roodhouse, Whitehall, Carrollton, Jerseyville, Alton and East Alton and all intermediate points.

At all such times defendant was a carrier of passengers for hire on Route 67 between Roodhouse and East Alton, by means of four motorbusses owned and operated by him and his bus drivers, and in so doing he served all intermediate points.

176

Defendant has not complied with the terms of the Public Utilities Act, claiming that the Illinois Commerce Commission did not have jurisdiction over his operations for the reason that he was a private contract carrier.

There was admitted in evidence by agreement a card which the defendant called his "Contract of employment" or "Ticket for carriage of passengers." On the face of the card was printed the following:

| "1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 |
|---|
| Expires Jan. Feb. Mar. April May June |
| H. WATSON, Owner |
| 405 W. Mulberry Street |
| Jerseyville, Ill. |
| Expires July Aug. Sept. Oct. Nov. Dec. . |
| 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31" |

On the back of the card was printed the following:

"WESTERN CARTRIDGE EMPLOYEES
TRANSPORTATION CONTRACT

"In Consideration of the sum of $ _____ paid to the undersigned, H. Watson of Jerseyville, Illinois, he agrees to transport in his vehicle, of which he is the owner, the person who signs this Contract and is known as a Rider, between 'Kane, Jerseyville and Alton' as designated opposite signature, to the plants of the Western Cartridge Company, Boxboard, Steel Mill, Glass Works, Flour Mill and Duncan Foundry in Alton and East Alton, Illinois, and return at least once a day if requested until the expiration of this Contract which is indicated on the reverse side.

"It will only be necessary for the Contract Rider to display this Contract to the one in charge of the transporting vehicle for examination upon the entering of said vehicle.

"Return this contract on expiration date or upon signing another.

Kane

_____
 Owner

Jerseyville
_____
 Rider"

An investigator for the Illinois Commerce Commission testified that the defendant stated to him that he carried any person who said he was a worker and was willing to buy a ticket.

Plaintiff's traffic manager testified that plaintiff maintained regular schedules of time, that when sufficient persons failed to use the commuter schedules of service provided by plaintiff those schedules were withdrawn, that plaintiff was not restricted in its operations in the territory, but could and would maintain any schedules of service which public convenience and necessity required, that no service had been refused to any person in the territory in question, and that plaintiff was ready, able and willing to render any necessary service.

The defendant, testifying adversely and as a witness in his own behalf, testified that he started operating his busses in 1948 after the plaintiff quit hauling workers to different named factories, that he carried any one who had a badge and said he was a worker, that he instructed drivers to haul any worker who said he was a worker at one of the main factories and had a badge, that when starting he applied to the Illinois Commerce Commission for a permit, but they told him he did not need one, that his busses were scheduled to meet and accommodate shifts at the different factories, that when the plaintiff ceased operating out of Roodhouse, Whitehall and Carrollton, people came to him and wanted to know if he would pick them up, and workers came to him from Carrollton, Whitehall and Rood-

178

house and wanted to know if he would take them to work, that he did not advertise in any newspaper, or by hand bills, loud speaker, radio, billboard, mail, or by public schedule of routes, that he made no investigation of the passengers to determine what their employment was, that from January 1, 1949, to March 31, 1950, he collected in gross revenues about $29,000, that his busses operated on round-trip schedules to meet the change of shifts at the industrial plants in Alton and East Alton, that he had fixed charges for his services, that all private contract tickets were sold on a six-day basis, that on the left side of his busses appeared a printed sign "Watson Bus Service. Operator H. Watson," that none of his busses carried a sign designating them as worker busses only, that he did not change his schedules of time except when it became necessary to shift from daylight to standard time, that each of his passengers had one of the tickets above described, that he did not sign all of the tickets himself, but his drivers sold the same and he would give his drivers five to fifty tickets at a time, that he did not know all the passengers and that the number of passengers varied from time to time, that he did not check to see where the passengers went when they got off the busses, that some of them wore badges and some did not, that he had regular stopping places where he picked up and discharged his passengers, that he also served a hospital in addition to the industrial plant, and served all the industrial plants in Alton and East Alton, and in so doing picked up passengers on Piasa and Cut streets in Alton and at certain other places.

A witness for the defendant testified he rode with the defendant because the plaintiff discontinued service, that plaintiff "ran us off the road by stopping at the main points and making us riders get out of our seats and give them to the cash customers," that plaintiff discontinued service in June, 1949, that he did not

know anyone who rode on defendant's busses without a contract, that one time he didn't have money and asked the defendant if he could ride and pay for the ticket the next day and that he did make such payment, that he had never seen the defendant stop and pick up anyone other than a worker who hailed the bus and paid cash.

Another witness for defendant testified that he had never seen anyone ride on one of defendant's busses without a contract, that on a couple of occasions he had seen defendant's bus stop and fellows wanted to ride, but on those occasions those people were refused.

Another witness testified that he rode defendant's busses after plaintiff's service was discontinued, and that at all times when on defendant's busses the witness had a contract for riding, and that he had seen no one flag down the bus who was not a worker.

The defendant relies principally on the case of *Illinois Highway Transp. Co. v. Hantel,* 323 Ill. App. 364, decided by this court in 1944. While some of the facts in the *Hantel* case are quite similar to the facts in the present case, there are material differences. In the *Hantel* case the defendant transported employees of only one factory, while in the present case the defendant transports employees to and from several different places of employment. In the *Hantel* case the signs on the defendant's busses read, "Walter Hantel. Caterpillar Men Only." In the present case the signs read, "Watson Bus Service. Operator H. Watson." In the *Hantel* case service, according to the opinion, was furnished "to the individual employees with whom specific arrangements were made for going to and from their places of employment." In the present case there was no such specific agreement, orally or in writing, but on entering a bus a patron, unless he already had a ticket, merely received and paid for the so-called "contract of

employment," which ticket was in fact not materially different from tickets issued by common carriers of passengers.

Section 10 of the Public Utilities Act (ch. 111 2/3 Ill. Rev. Stat. 1949) [Jones Ill. Stats. Ann. 112.027] provides that the term "public utility" when used in such Act, "means and includes every . . . individual . . . that now or hereafter . . . may own, control, operate or manage, within the State, directly or indirectly, for public use, any . . . equipment or property used or to be used for or in connection with the transportation of persons . . . ."

Such section further provides that the term "common carrier," when used in such Act "includes . . . every . . . individual . . . owning, operating or managing any such agency for public use in the transportation of persons . . . within the State, . . ."

Section 56 of the same Act provides that "No public utility shall begin the construction of any . . . , equipment . . . or facility which is not in substitution of any existing . . . equipment, property or facility . . . unless and until it shall have obtained from the Commission a certificate that public convenience and necessity requires such construction," and that "Whenever after a hearing the Commission determines that any new construction or the transaction of any business by a public utility will promote the public convenience and is necessary thereto, it shall have the power to issue certificates of public convenience and necessity."

Paragraph 57, Section 55a of the same Act provides that, "No person . . . shall operate any motor vehicle, along or upon any public street or highway in this State, for the carriage of passengers for hire, *indiscriminately accepting and discharging such persons as may offer themselves for transportation,* along the

181

course on which such vehicle is operated, unless he shall (1) file with the commission, a sworn statement, . . ." etc. (Our italics.)

██ In *Choate v. Commerce Commission,* 309 Ill. 248, 256, the court said: "If shoestring transportation companies, with no money invested in right of way and no reserve capital to provide adequate service or to protect the public from damage, are permitted to drop in here and there and take the cream of the transportation business from the permanent transportation systems, disastrous results are inevitable. . . . The theory of the Public Utilities Act is to provide the public with efficient service at a reasonable rate by compelling an established carrier occupying a given field to provide adequate service and at the same time to protect the existing utility from ruinous competition . . . ."

In *West Sub. Trans. Co. v. Chicago & W. T. Ry. Co.,* 309 Ill. 87, 91, the court said: "The policy established by that act is, that through regulation of an established carrier occupying a given field and protecting it from competition it may be able to serve the public more efficiently and at a more reasonable rate than would be the case if other competing lines were authorized to serve the public in the same territory. Methods for the transportation of persons are established and operated by private capital as an investment, but as they are public utilities the State has the right to regulate them and their charges, so long as such regulation is reasonable. The policy of the Public Utilities Act is that existing utilities shall receive a fair measure of protection against ruinous competition."

In *Springfield Gas Co. v. Springfield,* 292 Ill. 236, 239, the court said: "We are disposed to agree with the proposition of appellant that a private corporation lawfully operating a public utility may have an injunction against another private corporation operating

without authority of law a similar utility which competes with and injures the former's business.''

In *Danville, Urbana, & Champaign Ry. Co. v. T. L. Clark Truck Co.*, 231 Ill. App. 339, 343, the court said: ''The only method by which the Commerce Commission could enforce any order which it might make in the premises would be to file a bill for an injunction praying for the identical relief sought in the present bill, and as the right to pray for an injunction is not limited to the Commerce Commission, we see no good reason why appellee should be compelled to await the action of the Commerce Commission before resorting to a court of chancery even though it did appear before the Commerce Commission.''

The undisputed evidence shows that the defendant transports all employees of each factory, and of a laundry and hospital, whether or not he knows them to be employees in fact,—except perhaps officers and those using their own cars. Of course in any factory, large or small, the number of officers is very small as compared to the number of employees, so that in fact the defendant transports practically everyone connected with each employer who desires to ride. The defendant has not had any contract of carriage with any employer. He has at all times transported and now transports all of his patrons without any contract whatever until such patron enters or is about to enter a bus. Until the ticket is sold there is in fact no real enforceable contract with any such patron.

 It is our opinion that such evidence shows that, in fact, defendant indiscriminately accepts and discharges all such persons as offer themselves for transportation and that such conduct of the defendant is in fact an obvious attempt to evade the provisions of Section 57 of the Public Utilities Act, and that therefore such conduct should not have judicial sanction.

■ It is also our opinion that the evidence shows defendant's operations have interfered and do interfere with and amount to unlawful competition with the operations of the plaintiff, to the substantial injury of plaintiff.

■ The decree appealed from is reversed and the cause is remanded to the circuit court with directions to enter a decree perpetually enjoining the defendant as prayed for in the complaint.

*Reversed and remanded with directions.*