# Illinois Official Reports

## Supreme Court

*Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302

| | |
|---|---|
| Caption in Supreme Court: | ILLINOIS LANDOWNERS ALLIANCE, NFP, *et al.*, Appellees, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Appellants. |
| Docket Nos. | 121302, 121304, 121305, 121308 cons. |
| Filed | September 21, 2017 |
| Rehearing denied | November 20, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on a petition for review of order of the Illinois Commerce Commission. |
| Judgment | Affirmed. |
| Counsel on Appeal | Sean R. Brady, of Wind on the Wires, of Wheaton, for appellant Wind on the Wires. |

Diana Z. Bowman, Christina A. Jacobson, and Owen E. MacBride, of Schiff Hardin LLP, and Mara S. Georges and Michael J. Synowiecki, of Daley and Georges Ltd., both of Chicago, for appellant Rock Island Clean Line.

John N. Moore, of Natural Resources Defense Council, of Chicago, for appellant Natural Resources Defense Council.

Patrick K. Shinners and Rochelle G. Skolnick, of Schuchat, Cook & Werner, of St. Louis, Missouri, for appellant International Brotherhood of Electrical Workers.

Douglas P. Harvath, General Counsel, of Illinois Commerce Commission, and Matthew L. Harvey and James E. Weging, Special Assistant Attorneys General, all of Chicago, for appellant Illinois Commerce Commission.

John D. Albers, Jonathan LA Phillips, Melissa N. Schoenbein, and William M. Shay, of Shay Phillips, Ltd., of Peoria, and Michael T. Reagan, of Ottawa, for appellee Illinois Landowners Alliance, NFP.

Charles Y. Davis and Claire A. Manning, of Brown, Hay & Stephens, LLP, of Springfield, for appellee Illinois Agricultural Association.

Jenner & Block LLP (Clifford W. Berlow, of Chicago, Matthew E. Price (*pro hac vice*), of Washington, D.C.), Richard G. Bernet and Anastasia M. Polek, of Exelon Corporation, and E. Glenn Rippie, of Rooney, Rippie & Ratnaswamy LLP, both of Chicago, for appellee Commonwealth Edison Company.

Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, Brett E. Legner, Deputy Solicitor General, and James Gignac, Assistant Attorney General, of Chicago), *amicus curiae*.

John C. Martin, of MartinSirott LLC, of Chicago, and Michael E. Engleman, of Squire Patton Boggs (US) LLP, of Washington, D.C., for *amicus curiae* LSP Transmission Holdings, LLC.

David D. Streicker, Paula S. Kim, and Colleen S. Walter, of Polsinelli PC, of Chicago, for *amicus curiae* Infinity Renewables.

Jacques T. LeBris Erffmeyer and Kristin C. Munsch, of Citizens Utility Board, of Chicago, *amicus curiae*.

Justices                         CHIEF JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1      This matter is before the court on administrative review of an order by the Illinois Commerce Commission (Commission) granting a certificate of public convenience and necessity to Rock Island Clean Line, LLC (Rock Island), for construction of a high voltage electric transmission line between O'Brien County, Iowa, and a converter station adjacent to a Commonwealth Edison Company (ComEd) substation in Grundy County, Illinois. The appellate court reversed the Commission's order on the grounds that the Commission had no authority under the Public Utilities Act (Act) (220 ILCS 5/1-101 *et seq.* (West 2012)) to consider Rock Island's application for a certificate of public convenience and necessity because the company did not qualify as a public utility under Illinois law. 2016 IL App (3d) 150099. The Commission and various entities involved in the Commission proceedings sought further review by our court through separate petitions for leave to appeal (Ill. S. Ct. R. 315 (eff. Mar. 15, 2016)). We granted those petitions and consolidated the proceedings for briefing, argument, and disposition. For the reasons that follow, we agree with the appellate court that the Commission's order must be reversed.

¶ 2                             BACKGROUND

¶ 3      Rock Island is a Delaware limited liability company with its principal offices in Houston, Texas. It is a wholly owned subsidiary of Rock Island Wind Line, LLC, which is, in turn, a wholly owned subsidiary of Clean Line Energy Partners, LLC (Clean Line). Clean Line is owned in part by Grid America Holdings, Inc. Grid America is a subsidiary of National Grid USA, a business that owns and operates more than 8600 miles of high voltage transmission facilities in the United States.

¶ 4      Rock Island plans to construct and manage a high voltage direct current (DC) electric transmission line running from an alternating current (AC)-to-DC converter station in O'Brien County, Iowa, to a planned DC-to-AC converter station in Grundy County, Illinois. An additional four-mile segment of AC lines would run from the planned converter station to ComEd's existing transmission system at or near its Collins substation, which is also in Grundy County.

¶ 5      The purpose of the proposed transmission line is to connect wind generation facilities in northwest Iowa, South Dakota, Nebraska, and Minnesota with electrical markets that utilize an electrical grid operated by PJM Interconnection, LLC (PJM), the regional transmission organization (RTO) responsible for coordinating the movement of wholesale electricity to markets in Illinois, Indiana, Michigan, Ohio, Kentucky, the District of Columbia, and eight states in the Northeast. Once completed, the line will extend for a total of 500 miles. Less than one-fourth of that distance, 121 miles, will be in Illinois. The remainder will be in Iowa.

¶ 6        Rock Island has never constructed a high voltage transmission line and does not yet own, control, operate, or manage any plants, equipment, or property in Illinois or elsewhere used or to be used in the transmission of electricity or for any other purpose related to utilities. Rather, it has an option to purchase certain real property in Grundy County. The property subject to the option is the proposed site for the DC-to-AC converter station at which the transmission line would terminate.

¶ 7        Witnesses for Rock Island testified that the project will cost approximately $1.8 billion to construct, operate, and maintain. As of December 2013, shareholders had committed approximately $95 million of equity to Clean Line, one of Rock Island's parent companies. Only about $21.6 million of this sum, however, was specifically invested in the Rock Island project.

¶ 8        Under the system currently in place in the United States, new transmission lines are typically constructed after an RTO such as PJM has conducted a transmission study and concluded the new line is necessary for the reliability of the system or to relieve transmission congestion. When the necessity for the new line has been established by the RTO, the developer who constructs the line is entitled to recoup its costs and receive a regulated rate of return on its investment through cost-based rates billed to the customers who benefit from the improved service. Rock Island, however, is not a member of PJM or any RTO, and its proposed project is outside the RTO approval process. Because of that, it will not be eligible to recover any of its construction costs through cost-based electrical rates paid by ratepayers in Illinois. Rather, this is to be a "merchant transmission" project. See Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities, 76 Fed. Reg. 49,842 (Aug. 11, 2011).

¶ 9        Merchant transmission projects are a relatively new development in the electricity transmission business and have arisen with the development of wind and other variable energy resources. In contrast to traditional public utilities, which are allowed to recover a regulated, cost-based rate of return from electricity customers on transmission line projects and other investments, merchant transmission developers obtain revenue to cover the costs of constructing and operating transmission facilities exclusively from power-generating customers who purchase transmission capacity and utilize the transmission service pursuant to negotiated contracts. Alexandra B. Klass & Jim Rossi, *Reconstituting the Federalism Battle in Energy Transportation*, 41 Harv. Envtl. L. Rev. 423, 440 n.73 (2017). Merchant transmission providers also differ from traditional public utilities in that they assume all of a project's market risks. Alexandra B. Klass, *Takings and Transmission*, 91 N.C. L. Rev. 1079, 1096 n.99 (2013). They have no obligation to undertake transmission projects and will do so only when such projects are financially viable. Heidi Werntz, *Let's Make a Deal: Negotiated Rates for Merchant Transmission*, 28 Pace Envtl. L. Rev. 421, 425 (2010).

¶ 10       Rock Island's project is currently still at the developmental stage, and its prospects are uncertain. As part of its initial planning, the company secured three interconnection queue positions with PJM to allow it to deliver 3500 megawatts of power to the grid PJM operates. The assignment of queue positions ensures that the existing grid system is capable of accepting the additional power, and obtaining a queue position is necessary before an entity may connect to PJM's grid. Since first obtaining its three queue positions, however, Rock Island has surrendered two of the positions and reduced the capacity it would add under the third to 1600

megawatts. It did so because it was unwilling or unable at this stage of the process to undertake the additional engineering and design work necessary before an interconnection agreement with PJM could be executed. The surrender of the positions does not foreclose Rock Island from requesting additional queue positions in the future.

¶ 11     Testimony established that the company cannot and will not move forward with the project unless and until a sufficient number of customers contract for power transmitted by the line to enable the company to attract the requisite financing. At the present time, no potential customers have obtained rights to buy service on the transmission line. Indeed, the wind generators that might use the transmission line and that serve as the basis for Rock Island's energy and financial simulation models do not yet exist.

¶ 12     Although there are not yet any customers for Rock Island's planned transmission service, the company plans to offer that service to any "eligible customers" under an open access transmission tariff (OATT) pursuant to Federal Energy Regulatory Commission (FERC) regulations. The FERC defines "eligible customers" broadly to include any buyer of transmission service, subject only to limitations contained in section 824k of the Federal Power Act (16 U.S.C. § 824k(h) (2012)).

¶ 13     The FERC has approved a proposal from Rock Island to "pre-subscribe" up to 75% of the proposed line's transmission capacity to anchor customers. Those customers will consist largely, if not entirely, of yet-to-be-built wind generators in the resource area of northwest Iowa, South Dakota, Nebraska, and Minnesota who seek to deliver the power they generate to the PJM grid. The remaining 25% of capacity will be sold at auction through a process known as "open season bidding." The FERC has not mandated that Illinois entities participate in the bidding process, and the project does not designate any part of the energy transmitted along the proposed line for public use in Illinois.

¶ 14     If any transmission capacity remains available after the open season bidding process concludes, any eligible customer may request service under the OATT. In handling such requests, Rock Island must comply with the FERC's open access requirements. The company will be prohibited from discriminating or showing undue preference in selling its transmission service.

¶ 15     The reason that the FERC is involved in the project is that under the Federal Power Act (16 U.S.C. § 791a *et seq.* (2012)), the FERC has exclusive authority to regulate "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b) (2012). *Hughes v. Talen Energy Marketing, LLC*, ___ U.S. ___, ___, 136 S. Ct. 1288, 1292 (2016). The FERC's jurisdiction also extends to all facilities for transmission of electric energy in interstate commerce, authority that is not limited to the wholesale market. 16 U.S.C. § 824(b) (2012); *New York v. Federal Energy Regulatory Comm'n*, 535 U.S. 1, 17 (2002) (*New York v. FERC*).

¶ 16     Although Rock Island's proposed transmission services are subject to the FERC's jurisdiction, the existence of FERC jurisdiction does not mean that state regulatory authorities have no say in the project. To the contrary, the Federal Power Act makes federal and state powers "complementary" and "comprehensive," so that there will be "no 'gaps' for private interests to subvert the public welfare." (Internal quotation marks omitted.) *Federal Energy Regulatory Comm'n v. Electric Power Supply Ass'n*, ___ U.S. ___, ___, 136 S. Ct. 760, 780 (2016) (quoting *Federal Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621, 631 (1972)). Identifying the precise contours of state and local authority under such collaborative

programs can be difficult and delicate. See *Allco Finance Ltd. v. Klee*, 861 F.3d 82, 101-02 (2nd Cir. 2017). Controlling federal precedent makes clear, however, that the siting of new transmission lines is generally not a matter within the jurisdiction of the FERC. James J. Hoecker & Douglas W. Smith, *Regulatory Federalism and Development of Electric Transmission: A Brewing Storm?*, 35 Energy L.J. 71, 82 (2014). Rather, Congress left to the states significant authority to regulate the siting of transmission lines. *New York v. FERC*, 535 U.S. at 24. Accordingly, any company wishing to construct an interstate transmission line must normally obtain siting permission and eminent domain authority from every state through which the line will pass, in accordance with the states' permitting processes and standards. Klass, *Takings and Transmission*, *supra*, at 1101.[1]

¶ 17    As noted earlier, the bulk of Rock Island's proposed transmission line will be located in the state of Iowa. In November 2014, Rock Island filed with the Iowa Department of Commerce Utilities Board 16 petitions for electric transmission line franchises for the 16 different Iowa counties through which the proposed line would run. The Iowa Utilities Board established a procedural schedule to govern that state's regulatory review of the project. Under that schedule, Rock Island was required to file certain documents beginning in January 2017. On December 22, 2016, however, Rock Island asked the Iowa Utilities Board for leave to withdraw all 16 petitions it had filed in connection with the project. The Iowa Utilities Board granted that request the following day. Although Rock Island advised Iowa authorities that it might submit new filings in that state depending on how judicial review of the regulatory proceedings in our state was ultimately resolved, the Iowa section of the project is currently dead. *In re Rock Island Clean Line LLC*, Iowa Dep't Com. Util. Bd. No. E-22248 (Dec. 23, 2016), https://efs.iowa.gov/cs/groups/external/documents/docket/mdax/njew/~edisp/1610798.pdf.

¶ 18    In addition to seeking regulatory approval in Iowa, Rock Island submitted an application to the Illinois Commerce Commission for issuance of a certificate of public convenience and necessity under section 8-406 of our Public Utilities Act (220 ILCS 5/8-406(a), (b) (West 2012)) to permit it to operate as a transmission public utility in Illinois and construct, operate, and maintain the electric transmission line just described. Rock Island also made a request pursuant to section 8-503 of the Act (220 ILCS 5/8-503 (West 2012)) for entry of an order authorizing or directing construction of the proposed line. In addition, Rock Island sought authorization to use the FERC Uniform System of Accounts to file the annual financial information reports required by the Commission and requested permission to maintain its books and records at a location outside Illinois.

¶ 19    Numerous entities, individuals, and organizations sought and were granted leave to intervene in the proceedings. Among these were ComEd; four local unions of the International Brotherhood of Electrical Workers (collectively referred to in this opinion as the IBEW); the Illinois Agricultural Association, a/k/a the Illinois Farm Bureau; and the Illinois Landowners

---

[1]A minority of states do not require state permitting and siting of transmission lines under certain circumstances, and in some situations transmission siting authority lies with the FERC. Hoecker & Smith, *supra*, at 82. See also Alexandra B. Klass & Elizabeth J. Wilson, *Interstate Transmission Challenges for Renewable Energy: A Federalism Mismatch*, 65 Vand. L. Rev. 1801, 1819 (2012) (discussing FERC "backstop siting authority" to override a state's siting authority where, *e.g.*, the state refuses to timely act or attaches project-killing conditions to a permit).

Alliance, NFP. Commission staff members also participated in the application process by submitting evaluations, reports, and recommendations.

¶ 20    The IBEW supported Rock Island's petition. ComEd, the Illinois Agricultural Association, and the Illinois Landowners Alliance all opposed it. The Illinois Agricultural Association and the Illinois Landowners Alliance also each filed motions to dismiss. As grounds for those motions, the organizations asserted that Rock Island did not meet the threshold criteria necessary to qualify as a public utility within the meaning of section 3-105 of the Act (220 ILCS 5/3-105 (West 2012)) and that the company was therefore ineligible for the relief it sought from the Commission.

¶ 21    Both motions were denied by a Commission administrative law judge (ALJ). The ALJ rejected the argument that Rock Island could not apply for a certificate of public convenience because it did not already have in place the transmission infrastructure that would qualify it as a public utility. Looking at the language of the applicable provisions of the Public Utilities Act, the ALJ held that nothing therein required applicants to own public utility plants, equipment, or property at the time they apply for certificates to construct public utility facilities. To construe the statutes as imposing such a requirement would, in the ALJ's view, create an unworkable "Catch-22." Specifically, it would mean that

> "an entity could not apply for a certificate to construct public utility facilities and transact public utility business unless the entity already owns public utility plant, equipment or property. Under Section 8-406(b), however, constructing the public utility facilities needed in order to apply for a certificate, without already possessing a certificate authorizing construction of those facilities, is prohibited."

¶ 22    The ALJ also found support for this conclusion in the past practices of the Commission. The ALJ pointed out at least one other case in which the Commission had granted a certificate of public convenience and necessity for construction of an electric transmission line and for operation as a public utility to an entity that was not yet a certified public utility within the meaning of the Public Utility Act at the time that it first filed to obtain certification for construction of the transmission line.

¶ 23    Following denial of the motions to dismiss, the matter proceeded to a hearing. Extensive testimony was presented, and the matter was thoroughly briefed by the parties. Based on the evidence presented and the applicable law, the Commission issued a 226-page order in which it concluded that the ALJ had acted correctly in denying the motions to dismiss, found that the Commission had authority to consider Rock Island's application, and granted Rock Island the certificate of public convenience and necessity it had requested. The Commission also allowed the requests Rock Island had made regarding record keeping, subject to certain conditions. It did not grant the company's request for relief under section 8-503 of the Act (authorizing or directing construction of the line) but specified that its determination was without prejudice to the company's right to seek such relief in the future.

¶ 24    ComEd, the Illinois Agricultural Association, and the Illinois Landowners Alliance requested rehearing, which the Commission denied. They then sought administrative review in the appellate court. 220 ILCS 5/10-201(a) (West 2014). There, they raised two arguments: first, that the Commission lacked authority to grant Rock Island's application for a certificate of public convenience and necessity because Rock Island does not qualify as a public utility within the meaning of the Public Utilities Act (220 ILCS 5/1-101 *et seq.* (West 2012)) and,

second, that the Commission's findings in favor of Rock Island were not supported by substantial evidence. 2016 IL App (3d) 150099, ¶ 31.

¶ 25 The appellate court found the first of these arguments to be dispositive. Initially, it acknowledged that an applicant need not already have status as a public utility before seeking a certification of public convenience and necessity under sections 8-406(a) and (b) of the Public Utility Act (220 ILCS 5/8-406(a), (b) (West 2012)). Rather, applicants may seek recognition as a public utility while, at the same time, applying for a certificate of public convenience and necessity to transact business and construct facilities within our state. 2016 IL App (3d) 150099, ¶ 49. The problem in this case, in the appellate court's view, was that Rock Island failed to meet the qualifications to be a public utility as that term is defined by the Public Utilities Act because it neither owned, controlled, operated, or managed utility assets, directly or indirectly within the state, nor did it offer such assets for public use without discrimination. *Id.* ¶¶ 43-46.

¶ 26 In light of its conclusion that Rock Island could not meet the requirements to qualify as a public utility, the appellate court reasoned that the Commission had no legal authority to issue the company a certificate of public convenience and necessity. *Id.* ¶ 47. It therefore reversed the Commission's order granting the certificate to Rock Island and remanded the cause to the Commission with directions to enter an appropriate order. *Id.* ¶ 53. The appellate court further concluded that it did not need to reach the additional question of whether the Commission's order was also subject to reversal because it was not supported by substantial evidence. *Id.* ¶ 51.

¶ 27 The Commission, Rock Island, the IBEW, Wind on the Wires, and the Natural Resources Defense Council (hereinafter referred to collectively as appellants) sought leave to appeal to our court pursuant to Illinois Supreme Court Rule 315 (eff. Mar. 15, 2016). As indicated at the outset of this opinion, we allowed appellants' requests and consolidated the cases for briefing, argument, and disposition. We also allowed the State of Illinois, Infinity Renewables, the Citizens Utility Board, and LSP Transmission Holdings, LLC, to file friend of the court briefs in support of appellants. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 28                                          ANALYSIS

¶ 29 When our court grants leave to appeal from a judgment of the appellate court in an administrative review case, as we did here, it is the final decision of the administrative agency and not the judgment of the appellate court that is before us. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 386 (2010). Review of final decisions of the Commission, the administrative agency whose ruling is being challenged in this case, involves the exercise of special statutory jurisdiction and is constrained by the provisions of the Public Utilities Act (220 ILCS 5/1-101 *et seq.* (West 2014)). *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 387 (2008). Section 10-201(d) of the Act provides that "[t]he findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission" and "rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable." 220 ILCS 5/10-201(d) (West 2014). The Public Utilities Act further provides, however, that a "court shall reverse a Commission *** order or decision, in whole or in part, if it finds," *inter alia*, that the "findings of the Commission are not supported by substantial evidence based on the entire record of

evidence" or the "order or decision is without the jurisdiction of the Commission" or the "order or decision is in violation of the State or federal constitution or laws." 220 ILCS 5/10-201(e)(iv) (West 2014).[2] In addition, courts are not bound by the Commission's rulings on questions of law. *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994). We review such questions *de novo*. See *City of Elgin v. Illinois Commerce Comm'n*, 2016 IL App (2d) 150047, ¶ 26.

¶ 30    Appellants contend that the Commission's decision in this case was factually and legally sound and that in reversing that decision and remanding the cause to the Commission, the appellate court adopted an unreasonable and erroneous construction and application of the governing statutes, departed from established principles of administrative review, and impermissibly usurped the role of the Commission in the regulatory process. For their part, ComEd, the Illinois Agricultural Association, and the Illinois Landowners Alliance (hereinafter appellees) argue, as they did in the appellate court, that the Commission's decision granting Rock Island's application for a certificate of public convenience and necessity is fatally infirm and should be set aside because Rock Island does not meet the qualifications to be considered a public utility within the meaning of the Public Utilities Act (220 ILCS 5/1-101 *et seq.* (West 2012)). Because it does not qualify as a public utility, they assert, the company was ineligible to receive, and the Commission had no authority to grant, a certificate of public convenience and necessity.

¶ 31    In undertaking our review, we look first to the governing statutory framework. The Public Utilities Act, as its name reflects, was enacted to provide for the regulation of "public utilities." *Springfield Gas & Electric Co. v. City of Springfield*, 292 Ill. 236, 243 (1920), *aff'd*, 257 U.S. 66 (1921). It arose from a conviction that "the health, welfare and prosperity of all Illinois citizens require the provision of adequate, efficient, reliable, environmentally safe and least-cost public utility services at prices which accurately reflect the long-term cost of such services and which are equitable to all citizens." 220 ILCS 5/1-102 (West 2012). Underlying the law is a belief that these objectives can best be met through governmental supervision of public utilities and regulation of competition between them. See *Commerce Comm'n v. Chicago Rys. Co.*, 362 Ill. 559, 566 (1936). Because unrestrained competition prior to adoption of the Act had frequently resulted in the financial failure of utilities, the law adopted the principle of regulated monopoly (*Local 777, DUOC, Seafarers International Union v. Illinois Commerce Comm'n*, 45 Ill. 2d 527, 535 (1970); *People v. City of Chicago*, 349 Ill. 304, 326 (1932)) and aims to ensure efficient public utility service at reasonable rates by compelling established public utilities occupying a given field to provide adequate service while at the same time protecting them from ruinous competition (*Gulf Transport Co. v. Illinois Commerce Comm'n*, 402 Ill. 11, 19 (1948); *Bartonville Bus Line v. Eagle Motor Coach Line*, 326 Ill. 200,

---

[2]While the statute and this court's precedent refer to the Commission's "jurisdiction," we have recently reiterated that the term "jurisdiction" is not strictly applicable when referring to an administrative agency. It may, however, be used as shorthand for describing the agency's authority to act. *Zahn v. North American Power & Gas, LLC*, 2016 IL 120526, ¶ 14 n.2 (citing *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, ¶ 23 n.6).

202 (1927); *Fountain Water District v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 696, 701 (1997)).[3] This court has therefore held that

> "before one utility is permitted to take the business of another already in the field it is but a matter of fairness and justice that it be shown that the new utility is in a position to render better service to the public than the one already in the field. *** The power of the State to regulate a utility carries with it the power to protect such utility against indiscriminate competition, and such power should be exercised to that end." (Internal quotation marks omitted.) *Chicago & West Towns Rys. v. Illinois Commerce Comm'n*, 383 Ill. 20, 26 (1943).

¶ 32    Because the Public Utilities Act was created to regulate public utilities, a threshold inquiry when determining the reach of the Act is whether a particular entity actually qualifies as a public utility. Entities that are not public utilities are generally not subject to regulation under the Public Utilities Act or to supervision and control by the Commission. *Fountain Water District*, 291 Ill. App. 3d at 701-02; but see *Zahn v. North American Power & Gas, LLC*, 2016 IL 120526, ¶ 21 (noting that alternative regional energy suppliers, while not public utilities, remain subject to certain requirements under the Commission's authority). At the same time, however, such entities are foreclosed from the market protections and other advantages that the Public Utilities Act confers.

¶ 33    In this case, the Commission did not reach out to compel Rock Island to submit to its regulatory authority. Rather, Rock Island has undertaken to place itself under the Commission's authority voluntarily. Why it has done so is contested. Opponents of the project assert that the company is motivated by a desire to obtain the eminent domain power available to public utilities under the Public Utilities Act. See 220 ILCS 5/8-509 (West 2012). Rock Island disputes this, arguing that it is not currently seeking eminent domain authority and may never do so if it succeeds in obtaining the easements it will need for the project through negotiated agreements with affected landowners.

¶ 34    Rock Island's explanation for why it has proceeded as it has is twofold. First, it contends that it simply wants to comply with the law. It believes that if it ultimately moves forward with the project, its transmission system will, in fact, qualify as a public utility facility and that the service it provides will constitute a public utility service within the meaning of the Public Utilities Act and that it therefore needs to obtain a certificate of public convenience and necessity pursuant to section 8-406 of the Act (220 ILCS 5/8-406 (West 2012)) before moving forward. While it may seem counterintuitive for a corporation to voluntarily submit to the state's regulatory authority, especially where, as here, it disavows any intention to exercise the primary benefit of doing so—obtaining eminent domain authority—there is one advantage to obtaining the proper certifications in advance. If the corporation were to proceed without first obtaining regulatory approval and was subsequently found to be a public utility within the meaning of the Public Utilities Act and operating without the requisite legal authorization, the Illinois Commerce Commission could bring an action in circuit court to enjoin the company's

---

[3]As discussed in our recent decision in *Zahn*, 2016 IL 120526, ¶ 20, Illinois has taken steps to partially deregulate its electricity market through enactment of the Electric Service Customer Choice and Rate Relief Law of 1997 (220 ILCS 5/16-101 *et seq.* (West 2012)). While appellants make references to the goals of that statute, they have failed to explain how its substantive provisions apply to the regulatory process involved in this appeal.

violation or threatened violation of the law, and the project could be halted. See 220 ILCS 5/4-202 (West 2012).

¶ 35    The company's second justification for seeking to place itself within the provisions of the Public Utilities Act and obtaining a certificate of public convenience and necessity from the Commission is similarly pragmatic. If it is under state regulatory authority, it will avoid the need to obtain local approval from each governmental unit through which the project will pass. See *Commonwealth Edison Co. v. City of Warrenville*, 288 Ill. App. 3d 373, 380 (1997) ("Public Utilities Act preempts enforcement of ordinances adopted by home rule units and non-home-rule units that regulate or effectively regulate public utilities, at least where *** the subject matter involves Commission-approved construction projects that are intended to facilitate the transmission of electric service").

¶ 36    While the parties dispute what is driving Rock Island's strategy, resolution of the question is unimportant. Whatever Rock Island's motives for seeking a certificate of public necessity and convenience, the central question remains: Does it even qualify as a public utility under Illinois law so as to be eligible for such a certificate under section 8-406 of the Public Utilities Act (220 ILCS 5/8-406 (West 2012))?

¶ 37    Under the Act, "public utility" is defined to mean and include, except where otherwise expressly provided,

> "every corporation, company, limited liability company, association, joint stock company or association, firm, partnership or individual, their lessees, trustees, or receivers appointed by any court whatsoever that owns, controls, operates or manages, within this State, directly or indirectly, for public use, any plant, equipment or property used or to be used for or in connection with, or owns or controls any franchise, license, permit or right to engage in:
>
> > (1) the production, storage, transmission, sale, delivery or furnishing of heat, cold, power, electricity, water, or light, except when used solely for communications purposes[.]" 220 ILCS 5/3-105(a) (West 2012).

¶ 38    The mere fact that a company sells heat, cold, water, electricity or any of the various other things ordinarily sold by public utilities does not, in itself, make the enterprise a public utility. *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n*, 1 Ill. 2d 509, 516 (1953); *Peoples Energy Corp. v. Illinois Commerce Comm'n*, 142 Ill. App. 3d 917, 930 (1986). A company could, for example, build power generation and transmission systems to service a select group of industrial customers without falling subject to the Public Utilities Act or the regulatory oversight of the Commission. See, *e.g.*, *Highland Dairy Farms Co. v. Helvetia Milk Condensing Co.*, 308 Ill. 294 (1923) (private companies that had constructed water delivery system for their own use and use by limited number of other persons and concerns not subject to the Public Utilities Act).

¶ 39    In order to qualify as a public utility, the company must meet additional requirements. First, pursuant to the express language of section 3-105 of the Act (220 ILCS 5/3-105 (West 2012)), the company must also *own, control, operate, or manage*, within this State, directly or indirectly, a plant, equipment, or property used or to be used for or in connection with (or must own or control any franchise, license, permit, or right to engage in) the production, transmission, sale, etc. of one of the specified commodities or services. Second, it must own, control, operate, or manage the plant, equipment, property, franchise, etc. "for public use." *Id.*

¶ 40    Rock Island fails to meet the first of these requirements. When referring to the ownership, control, management, and operation of a plant, equipment, property, franchise, etc., the statute is phrased in the present tense. As our discussion has indicated, however, Rock Island does not presently own, control, manage, or operate any plant, equipment, property franchise, etc., in Illinois or elsewhere to be used for or in connection with the production, transmission, or sale of electricity or any of the other commodities or services covered by the Public Utilities Act. It merely holds an option to acquire a parcel of real property. That is insufficient. Even though the parcel is the planned location for part of the yet-to-be-built transmission system, having an option to buy something is not the same as owning or even controlling it. Under Illinois law, an option agreement is simply a contract by which the owner of property agrees with another person that he or she shall have the right to buy the property at a fixed price within a time certain. *In re Estate of Frayser*, 401 Ill. 364, 373-74 (1948). It does not involve the transfer or property or an interest therein. *Terraces of Sunset Park, LLC v. Chamberlin*, 399 Ill. App. 3d 1090, 1096 (2010).

¶ 41    Agreeing with its ALJ, the Commission sought to avoid this problem by interpreting the statute's ownership requirement as encompassing situations in which a company did not currently own or operate utility-related assets but intended to acquire such assets after regulatory approval was granted in the future. Under a prior version of the Public Utilities Act, such an interpretation would have been valid. Section 10 of the Public Utilities Act of 1913 (Ill. Rev. Stat. 1965, ch. 111⅔, ¶ 10.3), the predecessor to section 3-105 of the current law, defined a public utility to mean and include every corporation, company, association, joint stock company or association, firm, partnership, or individual that "*now or hereafter *** may* own, control, operate or manage" specified plants, equipment, or property. (Emphasis added.) Ill. Rev. Stat. 1965, ch. 111⅔, ¶ 10.3; *State Public Utilities Comm'n v. Noble Mutual Telephone Co.*, 268 Ill. 411, 414 (1915); *Jacksonville Bus Line Co. v. Watson*, 344 Ill. App. 175, 181 (1951). That language plainly and unambiguously encompassed situations where, as in this case, a company did not presently own any utility-related equipment or property but planned on acquiring some in the future.[4]

¶ 42    When the General Assembly repealed the prior Public Utilities Act and replaced it with the present statute, the "now or hereafter *** may" language was removed. With it went all reference to ownership in the future. As noted, the current law speaks only of ownership in the present tense. It is axiomatic that when the legislature amends an unambiguous statute by deleting certain language, it is presumed that the legislature intended to change the law in that respect. *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 2012 IL 112566, ¶ 21. We have not found, and appellants have not cited, anything that would bring that presumption into question here. Accordingly, we must read the current law as evincing an intention by the legislature to limit the definition of "public utility" to situations where the subject entity meets the ownership test at the present time. To hold otherwise would require not only that we read into the statute language that is not there but that we rewrite the statute to reinsert language the General Assembly affirmatively removed. That is something

_____

[4]*Wabash, Chester & Western Ry. Co. v. Commerce Comm'n*, 309 Ill. 412 (1923), a case cited by appellants in support of their position, was decided under this version of the law. Because the earlier version of the law did not require present ownership, that issue was neither raised nor reached in the *Wabash* case. Appellants' reliance on that case is therefore misplaced.

we may not do. *Zahn*, 2016 IL 120526, ¶ 15. Nor, of course, may the Commission. An administrative body is limited by the powers granted to it by the enabling statute. It is without authority to replace a statutory definition the legislature has deleted. See *Julie Q. v. Department of Children & Family Services*, 2013 IL 113783, ¶ 35.

¶ 43        Seeking to recast the question of legislative intent, appellants assert that, in the past, the Commission has actually granted certificates of public convenience and necessity to applicants who were not yet public utilities and did not yet own or control assets in Illinois. Several Commission orders are cited, including decisions from 1970, 2003, and 2007. Appellants contend that because the legislature has not amended section 8-406 of the Public Utilities Act (220 ILCS 5/8-406 (West 2012)) in light of these orders, we should deem it to have acquiesced in the Commission's interpretation of the law. This argument is without merit.

¶ 44        While appellees point out some significant factual distinctions between the administrative proceedings cited by appellants and the situation before us here, appellants' argument suffers from an even more fundamental problem. Cases where we have referenced the "acquiescence rule" in the context of administrative action have involved situations involving consistently followed, long-standing administrative rules, regulations, or interpretations of ambiguous statutes. See, *e.g.*, *People ex rel. Spiegel v. Lyons*, 1 Ill. 2d 409 (1953); *People ex rel. Watson v. House of Vision*, 59 Ill. 2d 508 (1974); *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36 (2002). These factors are not present here. With respect to the requirement of present ownership, control, operation, or management, the provisions of the Public Utilities Act relevant to the issuance of certificates of public convenience and necessity are not ambiguous, and the smattering of administrative decisions cited by appellants, to the extent that they bear any factual similarity to this case, can scarcely be said to represent a long-standing, consistent, and uniform construction of the law. We note, moreover, that acquiescence requires knowledge. We may presume that the legislature is aware of decisions we issue (*Kozak v. Retirement Board of Firemen's Annuity & Benefit Fund*, 95 Ill. 2d 211, 218 (1983)), but there is no basis for assuming that the legislature had any knowledge of the particular administrative rulings invoked by appellants, none of which were the subject of published court opinions.

¶ 45        Appellants further argue that the appellate court failed to give sufficient deference to the Commission's factual findings and improperly usurped its statutory authority to determine whether Rock Island qualified as a public utility. This argument must also fail. The facts relevant to the question on which this appeal turns—Rock Island's lack of ownership, control, management, etc. of property as specified in section 3-105 of the Public Utilities Act at the time it sought certification from the Commission—are undisputed. The real disagreement concerns the construction of law. Where, as here, the historical facts are admitted or established but there is a dispute as to whether the governing legal provisions were interpreted correctly by the administrative body, the case presents a purely legal question for which judicial review is *de novo*. *Goodman v. Ward*, 241 Ill. 2d 398, 406 (2011).

¶ 46        Of course, even when review is *de novo*, an agency's construction of the law may be afforded substantial weight and deference if the meaning of the terms used in a statute is doubtful or uncertain. Courts accord such deference in recognition of the fact that agencies make informed judgments on the issues based upon their experience and expertise and serve as an informed source for ascertaining the legislature's intent. *Provena Covenant Medical Center*, 236 Ill. 2d at 387 n.9. When statutory language is unambiguous, however, the agency's

role as an interpreter of doubtful law does not come into play (see *Dusthimer v. Board of Trustees of the University of Illinois*, 368 Ill. App. 3d 159, 165 (2006)), and an official's interpretation of a statute cannot alter the law's plain language. *Apple Canyon Lake Property Owners' Ass'n v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶ 21.

¶ 47    As we have already indicated, this is such a case. The language of section 3-105 (220 ILCS 5/3-105 (West 2012)) stands in clear contrast to its predecessor in plainly and unambiguously requiring present ownership, management, or control of defined utility property or equipment in order to qualify as a public utility. Because only public utilities are eligible to receive certificates of public convenience and necessity under section 8-406 of the Public Utilities Act (220 ILCS 5/8-406 (West 2012)) and because Rock Island cannot meet the ownership test necessary to qualify as a public utility, the Commission's order granting Rock Island a certificate of public convenience and necessity fails as a matter of law and cannot be sustained.

¶ 48    Echoing the "Catch-22" concerns expressed by the Commission's administrative law judge, appellants protest that interpreting section 3-105 of the Act (220 ILCS 5/3-105 (West 2012)) to require present ownership of utility infrastructure assets will effectively bar new entrants from qualifying as public utilities and obtaining certificates of public convenience and necessity under section 8-406 of the Act (220 ILCS 5/8-406 (West 2012)) so they may transact business as such. This concern is not well founded. Nothing in the Public Utilities Act prohibits new entrants such as Rock Island from commencing development of transmission lines immediately as a purely private project. So long as they do not transact business as a public utility, they will not be subject to the Public Utilities Act and will not require Commission authority to proceed. Once their projects are further underway and they have obtained the ownership, management, or control of utility-related property or equipment required to qualify as public utilities, they may then seek certification to operate as public utilities if they wish to conduct their business in a way that would make them subject to the Public Utilities Act's regulatory framework.

¶ 49    Requiring new entrants to proceed in this way may make the initial phase of their operations more difficult and cumbersome. For example, they will not have the benefit of eminent domain to obtain the property on which their facilities will be located. In Rock Island's case, however, that particular problem should be no obstacle. As we have noted, the company has not sought, is not seeking, and represents that it may never ask for eminent domain power.

¶ 50    In any case, the fact that there may be barriers and significant costs to new companies wishing to enter the state to establish a new public utility is in no way incompatible with the theory and operation of the Public Utilities Act. The Act, after all, is based on a model of limited monopoly and reflects a policy of preventing rather than promoting competition with existing utilities. *Gulf Transport Co.*, 402 Ill. at 19-20. One may disagree with that model, but the wisdom of this state's regulatory system is a matter for the legislature, not our court. Of all the principles of statutory construction, few are more basic than that a court may not rewrite a statute to make it consistent with the court's own idea of orderliness and public policy. *Board of Education of Roxana Community School District No. 1 v. Pollution Control Board*, 2013 IL 115473, ¶ 25.

¶ 51    Because Rock Island cannot meet the ownership requirement for qualification as a public utility, there is no need to reach the additional question of whether it also fails the "public use"

requirement, as the appellate court concluded. Should the company elect to move forward with the project and reapply for a certificate of public necessity and convenience as a public utility once it moves beyond planning and actually owns, controls, operates, or manages transmission assets, the question of public use can be revisited under the facts and circumstances then present. Any ruling on the question now would be purely advisory. That being so, there is likewise no need to address appellants' argument that the appellate court's construction of the public use requirement imposes an impermissible burden on interstate commerce in violation of the commerce clause of the United States Constitution (U.S. Const., art. I, § 8, cl. 3).

¶ 52                                    CONCLUSION

¶ 53      For the foregoing reasons, we agree with the appellate court that the Commission erred in finding that Rock Island is a public utility. The company does not qualify as a public utility under Illinois law and was ineligible for a certificate of public convenience and necessity from the Commission. The appellate court was therefore correct when it reversed the Commission's order granting a certificate of public convenience and necessity to the company, and it properly remanded the cause to the Commission with directions to enter an order consistent with its opinion. Accordingly, its judgment is affirmed.

¶ 54      Affirmed.