# Illinois Official Reports

## Appellate Court

> ### *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*,
> ### 2016 IL App (3d) 150099

| | |
|---|---|
| Appellate Court Caption | ILLINOIS LANDOWNERS ALLIANCE, NFP, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION; COMMONWEALTH EDISON COMPANY; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO LOCAL UNIONS 51, 9, 145 AND 196; ILLINOIS AGRICULTURAL ASSOCIATION, a/k/a Illinois Farm Bureau; WIND ON THE WIRES; ENVIRONMENTAL LAW AND POLICY CENTER; NATURAL RESOURCES DEFENSE COUNCIL; BUILDING OWNERS AND MANAGERS ASSOCIATION OF CHICAGO; DYNEGY MIDWEST GENERATION, LLC; DYNEGY KENDALL ENERGY, LLC; AMEREN TRANSMISSION COMPANY OF ILLINOIS; MIDWEST GENERATION, LLC; JOHN L. CANTLIN; and JOSEPH H. CANTLIN, Respondents.—ILLINOIS AGRICULTURAL ASSOCIATION, a/k/a Illinois Farm Bureau, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION; ROCK ISLAND CLEAN LINE, LLC; COMMONWEALTH EDISON COMPANY; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO LOCAL UNIONS 51, 9, 145 AND 196; ILLINOIS LANDOWNERS ALLIANCE, NFP; WIND ON THE WIRES; ENVIRONMENTAL LAW AND POLICY CENTER; NATURAL RESOURCES DEFENSE COUNCIL; BUILDING OWNERS AND MANAGERS ASSOCIATION OF CHICAGO; DYNEGY MIDWEST GENERATION, LLC; DYNEGY KENDALL ENERGY, LLC; AMEREN TRANSMISSION COMPANY OF ILLINOIS; MIDWEST GENERATION, LLC; JOHN L. CANTLIN; JOSEPH H. CANTLIN; TIMOTHY B. CANTLIN; FRIESLAND FARMS, LLC; LARRY GERDES; STEVEN GERDES; JASON D. JAMES; JAMES BEDEKER; SALLY BEDEKER; and FIRST MIDWEST BANK TRUST #6243, Respondents.—COMMONWEALTH EDISON COMPANY, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION; ROCK ISLAND CLEAN LINE, LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO LOCAL UNIONS 51, 9, 145 AND 196; ILLINOIS AGRICULTURAL ASSOCIATION, a/k/a Illinois Farm Bureau; |

WIND ON THE WIRES; ENVIRONMENTAL LAW AND POLICY CENTER; NATURAL RESOURCES DEFENSE COUNCIL; BUILDING OWNERS AND MANAGERS ASSOCIATION OF CHICAGO; DYNEGY MIDWEST GENERATION, LLC; DYNEGY KENDALL ENERGY, LLC; AMEREN TRANSMISSION COMPANY OF ILLINOIS; MIDWEST GENERATION, LLC; ILLINOIS LANDOWNERS ALLIANCE, NFP; JOHN L. CANTLIN; JOSEPH H. CANTLIN; TIMOTHY B. CANTLIN; FRIESLAND FARMS, LLC; LARRY GERDES; STEVEN GERDES; JASON D. JAMES; JAMES BEDEKER; SALLY BEDEKER; And FIRST MIDWEST BANK TRUST #6243, Respondents.

| | |
|---|---|
| District & No. | Third District<br>Docket Nos. 3-15-0099, 3-15-0103, 3-15-0104 cons. |
| Filed | August 10, 2016 |
| Decision Under Review | Petitions for review of order of Illinois Commerce Commission, No. 12-0560. |
| Judgment | Reversed; cause remanded. |
| Counsel on Appeal | William M. Shay, of Shay Phillips, Ltd., of Peoria, for petitioner Illinois Landowners Alliance, NFP.<br><br>Claire A. Manning and Charles Y. Davis, both of Brown, Hay & Stephens, LLP, of Springfield, for petitioner Illinois Agricultural Association.<br><br>E. Glenn Rippie (argued) and Carmen L. Fosco, both of Rooney Rippie & Ratnaswamy LLP, Thomas S. O'Neill, of Commonwealth Edison Company, and Richard G. Bernet and Clark M. Stalker, all of Chicago, for Commonwealth Edison Company.<br><br>James E. Weging and Matthew L. Harvey (argued), both of Office of General Counsel, for respondent Illinois Commerce Commission. |

Rochelle G. Skolnick, of Schuchat, Cook & Werner, of St. Louis, Missouri, for respondent International Brotherhood of Electrical Workers.

Sean R. Brady, of Wheaton, for respondent Wind on the Wires.

Owen E. MacBride (argued) and Diana Z. Bowman, both of Schiff Hardin LLP, of Chicago, for respondent Rock Island Clean Line, LLC.

Panel                    JUSTICE LYTTON delivered the judgment of the court, with opinion. Justices Carter and Wright concurred in the judgment and opinion.

## OPINION

¶ 1        Illinois Landowners Alliance, NFP (ILA), Illinois Agricultural Association also known as Illinois Farm Bureau (IAA), and Commonwealth Edison Company (Com Ed) petition this court for review of an order of the Illinois Commerce Commission (Commission) allowing Rock Island Clean Line, LLC (Rock Island) to operate as a public utility under the Public Utilities Act (Act) (220 ILCS 5/1-101 *et seq.* (West 2012)) and granting the company a certificate of public convenience and necessity to construct, operate, and maintain a high voltage electric transmission line across several counties in Illinois. On appeal, petitioners argue that (1) the application should have been dismissed as a matter of law because Rock Island is not a public utility and (2) the Commission's findings in favor of a certificate of public convenience and necessity (CPCN) were not supported by substantial evidence. We reverse the Commission's order granting the certificate and remand for further proceedings.

¶ 2                        BACKGROUND
¶ 3        Rock Island is a subsidiary of Clean Line Energy Partners LLC (Clean Line), a transmission energy development company, with its principal offices in Houston, Texas. In addition to Rock Island, Clean Line owns four other companies that are developing long-distance transmission projects across the northern states. Clean Line is owned in part by Grid America Holdings, Inc., which is owned by National Grid USA, a business that owns and operates more than 8600 miles of high voltage transmission facilities in the United States.

¶ 4        Rock Island was formed to construct and manage an electric transmission line project that would run from O'Brien County in northwest Iowa to Grundy County in northeast Illinois. The primary purpose of the project is to connect wind generation facilities in northwest Iowa, South Dakota, Nebraska, and Minnesota with electricity markets on the PJM Interconnection grid. PJM is a regional transmission organization that coordinates the movement of wholesale electricity to markets in Illinois, Indiana, Michigan, Ohio, Kentucky, the District of Columbia, and eight other states in the northeast.

¶ 5      The proposed line would span 379 miles through Iowa to the Mississippi River, crossing the river in Princeton, Iowa, and entering Illinois near Cordova, Illinois. It would then extend approximately 121 miles in Illinois to a Com Ed substation in Grundy County (Collins substation).

¶ 6      In preparation for the project, Rock Island filed an application with the Commission for a certificate of public convenience and necessity under section 8-406 of the Act (220 ILCS 5/8-406(a), (b) (West 2012)) authorizing it to operate as a transmission-only public utility in Illinois and to construct, operate, and maintain an electric transmission line for wind energy. In its application, Rock Island stated that the development of additional transmission infrastructure is critical to our nation's ability to utilize its wind resources to meet the demand for electricity from renewable sources. Rock Island further claimed that although wind energy generates an alternating electrical current (AC), it is more cost effective to transmit the energy using a direct current (DC) transmission line.

¶ 7      According to the proposed plan, the Rock Island project would construct a high voltage direct current (HVDC) electric transmission line from Iowa to Illinois. The line would convert AC wind energy to DC electricity at a converter station in O'Brien County, Iowa. From there, the high voltage current would travel 500 miles to a DC-to-AC converter station in Grundy County, Illinois. The proposal stated that Rock Island would then run an AC transmission line a few miles to the Collins substation, where the electricity would be delivered into the PJM grid. The application set forth a proposed route for the line but did not seek the right of eminent domain.

¶ 8      Rock Island stated that the project has a capacity of 3500 megawatts and is able to connect up to 4000 megawatts of generating capacity in the resource area in Iowa to northern Illinois. At that rate, it will deliver 15 million megawatt-hours of electricity annually, enough to power 1.4 million homes.

¶ 9      Rock Island's application and supporting materials outlined a plan for raising the capital necessary to finance construction at an unspecified future date on a "project financing basis." Rock Island emphasized that it was a "merchant developer"—not a traditional utility with cost-based rates—and claimed that Illinois residents would not pay for the line through rate assessments. It does not plan to seek cost recovery through the electric rates paid by consumers in Illinois. Instead, it indicated that its rates will be regulated by the Federal Energy Regulatory Commission (FERC) and that the project will pay for itself through the revenues it receives from anticipated purchase agreements with wind generators. Rock Island stated that it plans to enter into long-term financing agreements with one or more wind generators, or "anchor tenants," in the resource area (northwest Iowa) and then attract lenders using the anchor tenant agreements as collateral. The financing plan included in the application did not identify any current anchor tenants or lenders.

¶ 10      Numerous parties sought and were granted leave to intervene, including ILA, IAA, Com Ed, local unions of the International Brotherhood of Electrical Workers, Wind on the Wires, and various private landowners. Commission staff members also participated in the application process by presenting evaluations, reports, and recommendations to the Commission.

¶ 11      Initially, IAA and ILA filed motions to dismiss, arguing that Rock Island was not a public utility under section 3-105 of the Act because it did not own infrastructure for electric transmission in Illinois. The intervenors argued that only a public utility may obtain a section

8-406(a) certificate to transact business and only a public utility may obtain a section 8-406(b) certificate to construct facilities. They maintained that because Rock Island was not a public utility, it could not be granted a certificate of public convenience and necessity under the Act.

¶ 12    The Commission's administrative law judge (ALJ) denied both motions. The ALJ ruled that the application process under section 8-406 of the Act is not limited to entities that are already certified public utilities and concluded that Rock Island could apply for public utility status and seek certification to construct and manage a transmission facility at the same time.

¶ 13    At the evidentiary hearing on the application, witnesses for Rock Island testified that its objective in constructing the project is to provide a direct transmission link for wind generating plants that will be built in the Iowa resource area and to transport that output to electricity markets in Illinois. According to Rock Island, the demand for electricity from renewable resources in Illinois and surrounding states will remain high for years to come due to state renewable portfolio standards requirements imposed by recent legislation. These state-imposed mandates require utilities to replace energy generated by fossil fuels with renewable energy, and at least 75% of that renewable energy must come from wind power.

¶ 14    David Berry, vice president of strategy and finance for Clean Line, characterized the proposed transmission line as a "merchant project" because Rock Island is assuming the market risk of the project. Rock Island does not have a process to recover its costs from ratepayers and therefore must sell capacity through negotiated contracts. Berry testified that the FERC approved Rock Island's proposal to presubscribe up to 75% of its transmission capacity to anchor tenants and sell the remaining 25% of the line's capacity to other generators. Rock Island would market its excess capacity using a bidding process, otherwise known as "open season" bidding, in which Rock Island would offer services to other wind generator customers along the line. According to Berry's testimony, the FERC order requires Rock Island to provide standardized generator interconnection service to any generator that requests to connect through the bidding process, subject to an open access transmission tariff administered by PJM.

¶ 15    Berry further testified that developers will not invest capital in the construction of additional wind generation facilities in the resource area without reasonable assurance of adequate transmission capacity and infrastructure to deliver the energy to population centers such as northern Illinois. He stated that while it is theoretically possible to move power from the resource area to northern Illinois using existing 345-kilovolt lines, it would entail substantially higher losses as compared to using the proposed HVDC transmission lines.

¶ 16    Rock Island admitted that the wind generators used in its energy and financial simulation models are based on predictions and do not yet exist. Currently, Rock Island does not have any transmission customers; the only way it could serve a customer is by building the project.

¶ 17    Rock Island witnesses further testified that the project will cost approximately $1.8 billion to construct, operate, and maintain. As of December 2013, shareholders had committed approximately $95 million of equity to Clean Line, with approximately $21.6 million specifically invested in the Rock Island project. Rock Island currently possesses an option to purchase real property in Grundy County, Illinois, upon which it intends to construct a converter station next to the Collins substation.

¶ 18    On cross-examination, Michael Skelly, the president of Rock Island and Clean Line, testified that on the date the application was filed, Rock Island did not own, control, operate, or

manage any transmission plants, equipment, or property in Illinois. He also stated that as of the date of his testimony, Rock Island still did not own property in Illinois.

¶ 19     Paul Marshall, an ILA board member, testified that ILA is a not-for-profit entity composed of approximately 300 members who own or have an interest in land impacted by the path of the transmission line. According to his testimony, roughly 100,000 acres of land fall on or along the proposed project route.

¶ 20     Dr. Jeffrey Gray, a federal electricity regulation and policies expert, performed an economic analysis for ILA. He testified that Rock Island "might be able to demonstrate need if it could show that the project is adequately subscribed." He noted that, until then, the demand or need for the project is "speculative." Gray explained that the electric industry has a structured wholesale marketing system that uses regional transmission organizations like PJM to collect the electricity generated in a region and distribute it to consumers, particularly those in need of renewable energy credits. In this case, Rock Island would use the transmission line to "ship" renewable energy created by the wind generators to the PJM grid. Gray noted that the Rock Island project is not currently included in the PJM regional transmission plan because none of the project's capacity has been contracted and no potential generators have obtained rights to buy service on the line.

¶ 21     Gray further testified that the impact of the project is unknown because Rock Island has not addressed the costs of negative land use impacts and has assumed traits and characteristics about connecting generators that cannot be substantiated because the generators have yet to be built. He opined that the financial aspects of the project leave open the possibility of switching the project from "merchant" status to "cost-allocation" status and allocating future transmission costs of unknown amounts to Illinois electricity customers.

¶ 22     Steven Naumann, another ILA expert, testified that the impact of the project on competition was unknown because the project was not sufficiently developed and had too many uncertain factors. He noted that while Rock Island stated that it has no current plans to request that the project be cost-allocated, the company does not explicitly rule out making such a future request.

¶ 23     Commission staff economist, Richard Zuraski, noted that a competitive electricity market already exists in Illinois and stated in his report that the proposed project was unnecessary. He further noted that the determination of whether the proposed project would promote the development of an effectively competitive electricity market was "subject to considerable uncertainty." Zuraski opined that Rock Island failed to demonstrate that the purported benefits of the project would outweigh its costs. He reported that, based on his model analysis, the economic benefit to Illinois electricity consumers was also subject to "considerable uncertainty." Zuraski stated that he was concerned that if the project failed to be successful in the competitive market, Rock Island would look to the Commission to get the project "back on its feet," a request that could end up costing ratepayers more money. He opined that, based on the project's financial uncertainty, it was an overstatement to say that there was no risk to Illinois ratepayers. Zuraski's concerns led Commission staff to conclude that Rock Island had not met its burden to show that the proposed project would promote development of an effectively competitive market that operates efficiently, is equitable to all customers, and is the least cost means of satisfying the objectives.

¶ 24     The staff report also noted that if and when the project becomes subject to a FERC open access transmission tariff requiring the provision of nondiscriminatory open access, the

project's limited capacity will still prevent Rock Island from providing access to all eligible customers. Staff concluded that Rock Island "is asking the Commission to *** grant it a CPCN so it looks like a 'public utility' for purposes of condemning private property to build its line, while at the same time it plans to offer only a token percentage of that line's capacity for 'public use.' "

¶ 25 In an attempt to address the financial concerns raised in its report, the Commission staff suggested several conditions, including that Rock Island "will not install transmission facilities *** on easement property until such time as Rock Island has obtained commitments for funds in a total amount equal to or greater than the total project cost."

¶ 26 The Commission issued a 242-page order granting Rock Island a certificate of public convenience and necessity to transact business as a transmission public utility and to construct, operate, and maintain the proposed transmission line over the preferred route described in the application. In its order, the Commission agreed with the ALJ's determination that Rock Island met the qualifications of a public utility and satisfied the public use requirement under section 3-105(a) of the Act. The Commission stated that, based on the information in the record, it seemed likely that the line would be used primarily, if not entirely, for delivery of wind energy from O'Brien County, Iowa, to the Collins substation in Illinois and that it was "reasonable to assume" potential users would include transmission customers who purchased capacity for delivery of electricity to northern Illinois.

¶ 27 The Commission also determined that the proposed project would promote public convenience and necessity under the Act. The Commission found that although Rock Island failed to demonstrate that the project was necessary to provide adequate, reliable, and efficient service to customers, it had presented sufficient evidence to demonstrate that the proposed line "will promote the development of an effectively competitive electricity market that operates efficiently, is equitable to all customers, and is the least cost means of satisfying those objectives." See 220 ILCS 5/8-406(b)(1) (West 2012).

¶ 28 In reaching its decision, the Commission noted that Rock Island's financial resources were insufficient to finance the project's construction but concluded that Rock Island could satisfy the financing requirement based on financing conditions proposed by Commission Staff. In accordance with those conditions, the order required Rock Island to submit documents to the Staff demonstrating that it had obtained the necessary financial commitments and to file compliance documents with the Commission before beginning construction on easement properties.

¶ 29 ILA, IAA, and Com Ed filed applications for rehearing, and the Commission denied their requests. All three parties filed separate petitions with this court, challenging the Commission's decision. We consolidated their petitions for review.

¶ 30                                                    ANALYSIS

¶ 31 Petitioners challenge the Commission's order on two grounds: (1) that the Commission lacked authority to grant a certificate of public convenience and necessity because Rock Island is not a public utility and (2) that the findings of the Commission are not supported by substantial evidence. Our resolution of the first issue is dispositive.

¶ 32                                    I. Standard of Review

¶ 33    On appeal, a reviewing court must reverse the Commission's decision if it finds that (1) the findings of the Commission are not supported by substantial evidence, (2) the Commission lacked jurisdiction to enter the order or decision, (3) the order or decision is in violation of the state or federal constitution or laws, or (4) the proceedings violated the appellant's constitutional rights. 220 ILCS 5/10-201(e)(iv) (West 2012).

¶ 34    The standard of review of the Commission's findings of fact is deferential. Orders of the Commission are deemed *prima facie* reasonable, and the Commission's findings of fact are deemed *prima facie* true. 220 ILCS 5/10-201(d) (West 2012). The Commission's findings of fact may only be overturned if they are against the manifest weight of the evidence. *Apple Canyon Lake Property Owners' Ass'n v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶ 57.

¶ 35    The Commission's interpretation of statutory standards is also entitled to deference; however, reviewing courts are not bound by its interpretation of law. *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 121 (1995). The Commission's interpretation of a statute is reviewed *de novo*. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 522 (2009). Where governing statutory language is clear and unambiguous, it must be applied as written, and there is no need to resort to extrinsic aids. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 657 (2005). Courts will not defer to an agency's construction where the statute is clear because "an interpretation placed upon a statute by an administrative official cannot alter its plain language." *Burlington Northern, Inc. v. Department of Revenue*, 32 Ill. App. 3d 166, 174 (1975).


¶ 36                         II. The Commission's Authority to Grant a CPCN

¶ 37    The Illinois Commerce Commission was statutorily created to exercise general supervision over all Illinois public utilities in accordance with the provisions of the Public Utilities Act. 220 ILCS 5/4-101 (West 2012). Under the Act, a public utility must obtain a certificate of public convenience and necessity from the Commission before transacting any business or constructing a high-voltage transmission line. 220 ILCS 5/8-406(a), (b) (West 2012). The Commission derives its authority to supervise public utilities and issue certificates of public convenience and necessity solely from the statute creating it and may not, by its own interpretation, extend its jurisdiction. *Sheffler v. Commonwealth Edison Co.*, 399 Ill. App. 3d 51, 60 (2010). The Commission's jurisdiction must be found, if at all, in its power to regulate public utilities. *Peoples Energy Corp. v. Illinois Commerce Comm'n*, 142 Ill. App. 3d 917, 924 (1986).


¶ 38                                    A. *Public Utility Status*

¶ 39    Public utility status is determined by operation of section 3-105 of the Act and conferred by order of the Commission authorizing the utility to transact business and construct and manage utility services. See 220 ILCS 5/3-105(a), 8-406(a), (b) (West 2012). Section 3-105 of the Act defines a "public utility" as any company that:

        "owns, controls, operates or manages, within this State, directly or indirectly, for public use, any plant, equipment or property used or to be used for or in connection with, or owns or controls any franchise, license, permit or right to engage in:

- 8 -

(1) the production, storage, [or] transmission *** of heat, cold, power, electricity, water, or light ***[.]" 220 ILCS 5/3-105(a)(1) (West 2012).

¶ 40    An applicant does not satisfy the statutory qualifications of a public utility simply because it sells something ordinarily sold by a public utility, such as heat, power, water, or electricity. *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n*, 1 Ill. 2d 509, 516 (1953). A public utility also must provide its product or service "for public use," carrying with it the duty of the producer or manufacturer to serve the public and treat all persons alike, without discrimination. *Id.* "The use must concern the public as distinguished from an individual or any particular number of individuals, but the use and enjoyment of the utility need not extend to the whole public or political subdivision." *Palmyra Telephone Co. v. Modesto Telephone Co.*, 336 Ill. 158, 164 (1929). A private company that provides public utility services according to its own terms and conditions does not meet the statutory definition of a public utility. See *Highland Dairy Farms Co. v. Helvetia Milk Condensing Co.*, 308 Ill. 294, 301 (1923) (company that constructed water plants and furnished water to select members of the community "according to [its] own wishes" was not a public utility).

¶ 41    According to these principles, there are essentially two prongs to attaining public utility status: (1) a company must own, control, operate, or manage utility assets, directly or indirectly, within the State; and (2) it must offer those assets for public use without discrimination. See *Mississippi River Fuel Corp.*, 1 Ill. 2d at 516-19. Based on its application and the evidence presented to the Commission, Rock Island failed to meet both requirements.

¶ 42                                    1. Assets Within the State

¶ 43    Rock Island does not own, control, operate, or manage assets within the State. In testimony before the Commission, Rock Island admitted that the project was in the planning stages and that it would only pursue construction if the company determined that it would be profitable in light of future market developments and financial support. Rock Island currently does not own any transmission assets in Illinois, nor does it have any agreements for service with renewable energy generators in this state. While the potential may exist for generators to purchase service on the line, no Illinois generators have agreed to use the proposed line.

¶ 44                              2. Public Use Without Discrimination

¶ 45    In addition, the proposed transmission line is not for public use without discrimination. In *Mississippi River Fuel Corp.*, a fuel supply company, Mississippi River Fuel, sold natural gas in Illinois through individual fuel contracts with 23 private industrial retail customers. It also sold natural gas to Illinois Power and Light Company and Union Electric Power Company for resale to the general public. *Mississippi River Fuel Corp.*, 1 Ill. 2d at 512. Although Mississippi had facilities and customers in Illinois, our supreme court affirmed the circuit court's conclusion that it was not a public utility because Mississippi River Fuel did not devote its services to "public use." *Id.* at 513. In reaching its decision, the court noted that Mississippi River Fuel's contracts with industrial retail customers were not based on fixed rates, that they varied as to terms and conditions, and that they were only offered to select customers. The court found that the interest of the general public was in obtaining an adequate supply of gas at reasonable prices from the public utility to which the company supplied natural gas for resale, not Mississippi River Fuel. *Id.* at 518-19. It concluded that, under such circumstances, the

company's act of selling gas to a limited group of industrial customers could not be characterized as "public use." *Id.* at 519.

¶ 46   Similarly, Rock Island's plan does not devote assets for public use in Illinois without discrimination. The anchor tenants, who will use a majority of Rock Island's transmission capacity, are wind generators in the resource area of northwest Iowa, South Dakota, Nebraska, and Minnesota. According to Rock Island, 75% of the project's capacity will be sold to generators in the resource area, who will then use the transmission line to deliver their product to the PJM grid. PJM will then distribute the renewable energy electricity to members of its multistate regional transmission organization. The remaining 25% will be sold to those seeking transmission services through an "open season" bidding process approved by the FERC. The FERC order approving the sale of excess capacity does not mandate that an Illinois wind generator or other renewable energy generator participate in the bidding process. But if it did, there is no way to know whether an Illinois energy generator will submit a successful bid. Moreover, the project does not designate any part of the renewable energy transmitted along the proposed line for public use in Illinois. Thus, it fails to satisfy the statute's public use requirement.

¶ 47   Based on its application and supporting documentation, Rock Island has not attained public utility status within the meaning of the Act. Because Rock Island is not a public utility, the Commission lacked authority to issue a certificate of public convenience and necessity under section 8-406(b) of the Act. See *Peoples Energy Corp.*, 142 Ill. App. 3d at 924.

¶ 48   B. *Public Utility Status as Applied to Section 8-406*

¶ 49   In reaching our conclusion, we acknowledge the Commission's position that public utility status is not a prerequisite to seeking a certificate of public convenience and necessity under sections 8-406(a) and (b). The Act does not require an applicant to be a public utility before it seeks certification under the appropriate provisions. A plain reading of the statute shows that an applicant may seek public utility status while, at the same time, applying for a certificate of public convenience and necessity to transact business and construct facilities. See 220 ILCS 5/8-406(a), (b) (West 2012). In this case, the issue is whether jurisdiction was properly conferred based on the Commission's decision that Rock Island was a public utility. We conclude that it was not.

¶ 50   III. The Commission's Findings

¶ 51   The petitioners also claim that the Commission's decision should be reversed because its findings are not supported by substantial evidence. We need not address this issue in light of our determination that the Commission lacked authority to issue a certificate of public convenience and necessity.

¶ 52   CONCLUSION

¶ 53   We reverse the order of the Illinois Commerce Commission, granting a certificate of public convenience and necessity, and remand the cause to the Commission with directions to enter an order consistent with this decision.

¶ 54   Reversed; cause remanded.