Rule 23 order filed
December 26, 2023.
Motion to publish granted
January 26, 2024.

2023 IL App (5th) 230073

NO. 5-23-0073

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| GRIDLIANCE HEARTLAND LLC, | ) | Appeal from the |
| | ) | Illinois Commerce |
| Petitioner-Appellant, | ) | Commission |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE ILLINOIS COMMERCE COMMISSION and | ) | No. 20-0263 |
| AMEREN ILLINOIS COMPANY, d/b/a | ) | |
| Ameren Illinois, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Boie and McHaney concurred in the judgment and opinion.

**OPINION**

¶ 1    The petitioner, GridLiance Heartland LLC (GridLiance), appeals directly from an interim order of the Illinois Commerce Commission (Commission), dated November 17, 2022, and subsequent denial of rehearing, dated January 5, 2023. The Commission found in its interim order that GridLiance met the definition of a public utility as defined in section 3-105 of the Illinois Public Utilities Act (220 ILCS 5/3-105 (West 2022)). Based on this finding, the Commission directed GridLiance to apply for a certificate of public convenience and necessity (CPCN) and the Commission reopened the proceeding. We affirm the Commission's order.

1

¶ 2                                    I. BACKGROUND

¶ 3     In August of 2018, GridLiance entered into a purchase agreement with Electric Energy, Inc. (EEI) for transmission assets which consisted of two substations in Joppa, Illinois, and six connecting 161 kilovolt transmission lines that extended into Kentucky. The Illinois portion of the facilities were in Ameren Illinois Company d/b/a Ameren Illinois's (Ameren) authorized service territory and connected to Ameren's electric transmission and distribution facilities.

¶ 4     After entering into the purchase agreement and prior to acquiring the EEI facilities, GridLiance petitioned the Commission in *GridLiance Heartland LLC*, Ill. Comm. Comm'n No. 18-1617 (Oct. 12, 2018), for a CPCN under section 8-406(a) of the Public Utilities Act. 220 ILCS 5/8-406(a) (West 2018). The CPCN would authorize GridLiance to own, control, operate, and manage the EEI facilities for public use, and to provide public utility electric transmission service over the facilities. GridLiance had argued that it should qualify as a public utility because, unlike EEI, GridLiance would offer nondiscriminatory service on the EEI transmission facilities to "eligible customers," including entities that would supply power to "end users" in Illinois.

¶ 5     Ameren intervened in *GridLiance*, Ill. Comm. Comm'n No. 18-1617, and argued that GridLiance was not a public utility or eligible for a CPCN. Ameren claimed that a determination could not be made on whether GridLiance was a public utility prior to the acquisition of the EEI facilities. On September 6, 2019, GridLiance withdrew its petition. The Commission subsequently dismissed *GridLiance*, Ill. Comm. Comm'n No. 18-1617 (Sept. 18, 2019), without determining whether GridLiance was a public utility under section 3-105 of the Public Utilities Act (220 ILCS 5/3-105 (West 2018)).

¶ 6     GridLiance and EEI had also petitioned the Federal Energy Regulatory Commission (FERC) for approval of the GridLiance acquisition of the EEI facilities. FERC issued an order on

2

August 28, 2019, denying, without prejudice, GridLiance's application. FERC found that GridLiance and EEI failed to demonstrate that the acquisition was consistent with the public interest because it would adversely impact customers' rates. GridLiance filed a subsequent application. On January 31, 2020, FERC conditionally approved GridLiance's acquisition of the EEI facilities subject to rate mitigation measures. GridLiance accepted the conditions.

¶ 7      GridLiance acquired the facilities from EEI on February 29, 2020. GridLiance transferred functional control of four transmission lines and associated facilities to the Midcontinent Independent System Operator, Inc. (MISO), a nonprofit, nonstock corporation that was a Regional Transmission Organization (RTO).

¶ 8      MISO managed the region's power grid which was approximately 65,000 miles of interconnected high-voltage transmission line. MISO additionally operated an energy and ancillary service market for approximately 200,000 megawatts of power generating resources. GridLiance, as an owner of transmission assets, continued to own and maintain its assets while MISO coordinated the use of individual assets and offered transmission services.

¶ 9      GridLiance's assets were subject to MISO's open access transmission tariff (MISO Tariff) because of the transfer of GridLiance's functional control to MISO. Illinois service customers in a specified pricing zone paid the aggregate rate of the annual revenue requirement for all transmission owners in the zone to recoup costs associated with owning and operating transmission assets. Ameren and its customers pay approximately $6 million in costs annually regarding GridLiance's MISO assets.

¶ 10     After GridLiance acquired the facilities, Ameren filed a complaint with the Commission against GridLiance, in *Ameren Illinois Co. v. GridLiance Heartland LLC*, Ill. Comm. Comm'n No. 20-0263 (Mar. 9, 2020). Ameren alleged that GridLiance failed to comply with multiple

3

requirements under the Public Utilities Act (220 ILCS 5/1-101 *et seq.* (West 2018)). Ameren's claims included that GridLiance was in violation for not lawfully operating as a public utility; transferring functional control of the EEI facilities to MISO without Commission approval; not providing the least-cost service and plant to Illinois customers; and for not possessing a CPCN.

¶ 11    On the same day that Ameren filed its complaint with the Commission, GridLiance filed a verified petition for declaratory ruling in *GridLiance Heartland LLC*, Ill. Comm. Comm'n No. 20-0264. GridLiance requested that the Commission determine whether it qualified as an Illinois public utility under section 3-105 of the Public Utilities Act (220 ILCS 5/3-105 (West 2018)) based on its acquisition of the EEI facilities and the transfer of their functional control to MISO.

¶ 12    Ameren filed a motion to intervene in *GridLiance*, Ill. Comm. Comm'n No. 20-0264, and requested to consolidate the two pending matters. GridLiance then filed a motion to suspend *Ameren*, Ill. Comm. Comm'n No. 20-0263, until a determination was made by the Commission on whether GridLiance was a public utility. The Commission denied Ameren's request to consolidate and granted GridLiance's motion to suspend.

¶ 13    GridLiance then filed a motion to dismiss Ameren's complaint for want of jurisdiction. GridLiance argued that the Commission did not have jurisdiction to consider Ameren's petition and GridLiance was not subject to the statutory obligations because GridLiance was not a "public utility" under the Public Utilities Act (220 ILCS 5/3-105 (West 2018)). GridLiance claimed that it did not sell electricity to end-use customers in Illinois nor did it offer transmission assets for public use in Illinois. GridLiance additionally argued that *res judicata* applied where the circuit court previously determined that EEI's ownership and operation of the transmission assets did not make EEI a public utility. See *Electric Energy, Inc. v. Illinois Commerce Comm'n*, No. 91-MR-175 (Cir. Ct. Sangamon County, Aug. 28, 1991).

4

¶ 14    *Electric Energy, Inc.* found that EEI was formed in 1950 by investor-owned utilities for the purpose of constructing, owning, and operating a steam-electric generating plant in Joppa, Illinois. *Electric Energy, Inc. v. Illinois Commerce Comm'n*, No. 91-MR-175 (Cir. Ct. Sangamon County, Aug. 28, 1991). At the time of the 1991 decision, Union Electric Company, Kentucky Utilities Company, Illinois Power Company, and Central Illinois Public Service Company had ownership shares in EEI. The Joppa plant only provided power and energy to the Department of Energy Gaseous Diffusion Plant (DOE Plant) in Paduch, Kentucky, the Tennessee Valley Authority, and to EEI's sponsors for resale. Sales by EEI were made pursuant to power supply contracts subject to FERC. EEI never sold electricity at retail to utility consumers in Illinois or held itself out to provide electricity to the general public in Illinois. The circuit court found that EEI was not a "public utility" pursuant to section 3-105 of the Public Utilities Act because it did not offer electric service to the public, or own or operate any plant, equipment or property for public use in Illinois. *Electric Energy, Inc. v. Illinois Commerce Comm'n*, No. 91-MR-175 (Cir. Ct. Sangamon County, Aug. 28, 1991).

¶ 15    GridLiance's motion to dismiss additionally referred to a September 8, 2016, Commission decision. The Commission found that EEI's ownership and use of the transmission assets did not render EEI a "public utility" under the Public Utilities Act and cancelled EEI's CPCN. Ill. Comm. Comm'n, On Its Own Motion No. 16-0429 (Sept. 8, 2016). GridLiance noted in its motion that the only change that it had made after acquiring the transmission assets from EEI was its transfer of four transmission lines and the associated facilities to MISO's functional control.

¶ 16    The administrative law judge denied GridLiance's motion to dismiss and found that MISO controlled GridLiance's transmission assets, and all eligible customers would be able to access the power flowing through the transmission assets pursuant to the MISO Tariff. Further, assets under

5

MISO's control would be used to provide utility service to the public in Illinois, and GridLiance met the definition of a public utility under section 3-105 of the Public Utilities Act. 220 ILCS 5/3-105 (West 2018). The administrative law judge additionally found that the statutory definition did not require that the transmission assets be used to serve end users.

¶ 17   On August 31, 2021, direct testimony was filed by GridLiance and Ameren. Noman Williams is senior director of operations for GridLiance and director of operations for GridLiance Holdco, LLC. Williams testified that GridLiance previously had "advanced the theory that it should be eligible to serve as a public utility in Illinois." Williams explained that the purpose of his testimony was to provide factual support that GridLiance was not operating as a public utility within Illinois.

¶ 18   According to Williams, EEI was a wholesale supplier and did not provide electric service to end users. GridLiance's operation was substantially the same as EEI, and EEI was not a public utility. GridLiance delivered wholesale electricity on behalf of third parties. GridLiance's transfer of functional control of four of the six transmissions lines to MISO was the only change that GridLiance made when compared to EEI's operation. Williams did not believe that GridLiance was a public utility where its rights were identical to EEI and where GridLiance did not provide service to end users or the public.

¶ 19   Erin Murphy, the director of development for GridLiance, additionally provided direct testimony. Murphy testified that GridLiance offered its transmission assets to MISO and MISO used those assets to serve eligible customers. If the transmission assets were used to provide a service to the Illinois public, MISO would provide the service, not GridLiance. Murphy testified that GridLiance did not meet the definition of a public utility because "it does not provide unbundled transmission service to end-user customers in Illinois."

6

¶ 20    Jeffrey Hackman, P.E., a senior director for Ameren, testified that Ameren provided electric transmission and distribution services in and around Joppa, Illinois. GridLiance's assets are connected to Ameren's electric transmission and distribution facilities in Joppa, Illinois. Hackman testified that "GridLiance does not own or intend to own its assets for private use." GridLiance transferred functional control of the assets acquired from EEI to MISO. MISO's purpose was to manage a portion of the interstate power grid for the benefit of the public. Under MISO's functional control, MISO provided nondiscriminatory open access to transmission facilities. The MISO Tariff established the terms and conditions for all eligible customers, and MISO must make transmission service available to any eligible customer. Hackman provided the definition of eligible customer as defined by the MISO Tariff as:

> "(i) Any electric utility (including the Transmission Owner(s), ITC Participants(s), and any power marketer), Market Participant, Federal Power Marketing Agency, or any person generating electric Energy for sale or for resale is an Eligible Customer under this Tariff. Electric Energy sold or produced by such entity may be electric Energy produced in the United States, Canada or Mexico. However, with respect to transmission service that the Commission is prohibited from ordering by § 212(h) of the Federal Power Act, such entity is eligible only if the service is provided pursuant to a state requirement that a Transmission Owner or ITC Participant offer the unbundled transmission service, or pursuant to a voluntary offer of such service by a Transmission Owner or ITC Participant; or (ii) Any retail customer taking unbundled transmission service pursuant to a state requirement that a Transmission Owner or ITC Participant offer the transmission service, or pursuant to a voluntary offer of such service by a Transmission Owner or ITC Participant, that is an Eligible Customer under this Tariff. Unbundled retail customers that seek to take local distribution service cannot be Eligible Customers under this Tariff with respect to that service."

Hackman testified that in general, an "eligible customer" was "any credit-worthy entity may take transmission service." Ameren was an "eligible customer." Ameren and its customers paid for GridLiance's MISO assets. Hackman additionally testified that FERC and GridLiance identified GridLiance as a public utility for federal purposes.

7

¶ 21    The rebuttal testimony of Williams and Hackman was filed on September 21, 2021. Williams testified that Hackman's position would render any entity that moved electric power, from a generator to a distributor of electricity, a public utility. Williams believed that GridLiance was not a public utility in Illinois because "the material facts are the same or substantially the same as when EEI operated the Transmission Assets at issue."

¶ 22    Hackman, in his rebuttal testimony, explained that end-use customers were not municipal wholesale customers or utility companies, they were individuals who used energy directly. End-use customers generally did not take service directly from transmission assets. There, however, was a link between the transmission of electricity and end-use customers. The energy flowing into MISO over the transmission assets was likely used in Illinois. He additionally testified that there was a difference between how EEI operated and how GridLiance's transmission assets were operated. EEI did not offer transmission services. GridLiance, on the other hand, separated the Joppa generation from the transmission lines and transferred four of the lines to MISO. "The transfer renders the lines available as part of the broader transmission grid to move electricity within MISO's footprint, in an open access and nondiscriminatory manner" for public consumption.

¶ 23    On December 7, 2021, the Commission filed the rebuttal testimony of Eric Lounsberry, the director of the Safey and Reliability Division for the Commission. Lounsberry testified that in 1991 EEI operated as a private utility. EEI's primary purpose was to transmit electricity from the Joppa generating plant to the DOE Plant, which closed. EEI was planning to retire the Joppa power plant and the transmission lines were the only remaining assets.

¶ 24    Lounsberry testified the purpose of a transmission line was to transport power. Transmission lines typically do not serve individual customers, apart from large customers, such

as the DOE Plant served by EEI's transmission lines. Lounsberry explained that if a determination was made that transmission lines under the functional control of a RTO were not for public use, then the Commission may not have authority over any transmission lines in Illinois. Lounsberry testified that the transmission lines under GridLiance's ownership were for public use and recommended that GridLiance seek a CPCN.

¶ 25    Surrebuttal testimony of Hackman and Williams was submitted on January 28, 2022. Both addressed the rebuttal testimony of Lounsberry. Hackman testified that Ameren was concerned about the lawful ownership and operation of the GridLiance transmission assets that were interconnected with Ameren's public utility facilities and costs to Ameren and other Illinois customers.

¶ 26    Williams testified that placing GridLiance's transmission assets under MISO operational control did not change the type of service or eligible customers along the lines and jurisdictional status of the lines should not change by changing the transmission operator from EEI to MISO. Williams testified that the DOE Plant ceased activities in 2013, three years prior to the Commission's 2016 ruling that EEI was not an Illinois public utility. Williams disagreed with Lounsberry's position that the MISO Tariff would render GridLiance a public utility where EEI had operated the same transmission assets under a FERC approved open access transmission tariff, which served the same function as the MISO Tariff.

¶ 27    On February 15, 2022, the surrebuttal testimony of Lounsberry was filed. Lounsberry's position remained the same and he recommended that the Commission direct GridLiance to seek a CPCN.

¶ 28    Hackman provided additional surrebuttal testimony on February 15, 2022, in response to GridLiance's witness, Williams. Hackman testified that the Commission was not bound by the

9

2016 order. Hackman testified that GridLiance's transmission assets were subject to the MISO Tariff and Illinois customers in MISO's Ameren zone pay for those transmission assets. Hackman additionally testified that EEI "expressly disavowed any intent to serve the public." On the other hand, GridLiance's "business purpose is to optimize the transmission grid for the public use and benefit."

¶ 29    The evidentiary hearing was held on March 1, 2022, to address the issue of whether GridLiance was a public utility and subject to the jurisdiction of the Commission. The parties offered the prefiled testimony and exhibits as evidence without objection and agreed on a deadline to submit briefs.

¶ 30    Ameren argued in its brief that GridLiance met the definition of a public utility under section 3-105 of the Public Utilities Act (220 ILCS 5/3-105 (West 2020)). GridLiance owned two substations and six connecting transmission lines which are used for the transmission of electricity in Illinois. GridLiance transferred functional control of a portion of the assets to MISO which cannot be for private use, GridLiance holds itself out to provide a public service, and has not claimed that its assets are for private use. Additionally, the Illinois public pays for GridLiance's MISO assets.

¶ 31    Ameren additionally argued that *res judicata* does not apply because the operative facts have changed since the entry of the 30-year-old decision that found EEI not to be a public utility. EEI's customers were the DOE Plant, the Tennessee Valley Authority, and EEI's sponsors. GridLiance's transmission assets, in comparison, are controlled by MISO and subject to the MISO Tariff. Additionally, the issue of whether MISO's functional control of transmission assets in Illinois renders the assets' owner a public utility was an issue of first impression in Illinois; therefore, *res judicata* could not apply. Ameren also asserted that *res judicata* does not apply to

10

Commission orders, including the 2016 Commission decision finding that EEI was not a public utility.

¶ 32    GridLiance argued in its brief that it was not a public utility because it did not sell electricity or other utility products in Illinois and its transmission assets were not for public use. GridLiance argued that MISO functioned as a wholesale transmission cooperative and MISO's activities are limited and not open to the public.

¶ 33    GridLiance additionally argued that *res judicata* bars Ameren's claims where the Commission was bound by *Electric Energy, Inc. v. Commerce Comm'n*, No. 91-MR-175 (Cir. Ct. Sangamon County, Aug. 27, 1991), which found that ownership of the transmission assets did not render the owner a public utility. GridLiance, like EEI, did not provide electric service to end-use customers in Illinois. *Res judicata* applied where the decision was final, the Commission and Ameren were parties or privies to the *Electric Energy, Inc.* decision, and the decision arose from the same transaction—the ownership of the transmission assets.

¶ 34    The Commission entered an interim order on November 17, 2023, to resolve the issue of whether GridLiance was a public utility and subject to the Public Utilities Act. The Commission found that GridLiance was a public utility where it owns assets in Illinois that were used to offer transmission service to the public. GridLiance was directed to seek a CPCN within 60 days of the interim order and the pending proceeding was reopened. GridLiance filed a motion to stay the proceeding pending resolution of GridLiance's filing of a CPCN, and it filed an application for rehearing. The administrative law judge submitted a recommendation that the Commission deny the application for rehearing. The Commission subsequently denied GridLiance's application for rehearing on January 5, 2023. GridLiance filed a petition for review on February 9, 2023.

11

¶ 35                                    II. ANALYSIS

¶ 36    On appeal, GridLiance argues the Commission erred in determining that GridLiance was a public utility, and erred in its determination that *res judicata* did not apply. GridLiance additionally argues that the Commission erred by requiring that GridLiance seek a CPCN, and by reopening the underlying proceeding to address Ameren's remaining claims.

¶ 37                         A. Public Utility Determination

¶ 38    Under the Public Utilities Act,

> "[t]he findings and conclusions of the Commission on questions of fact shall be held *prima facie* to be true and as found by the Commission; rules, regulations, orders or decisions of the Commission shall be held to be *prima facie* reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions." 220 ILCS 5/10-201(d) (West 2022).

A Commission order shall be reversed, in whole or in part, if (1) the order's findings are not supported by substantial evidence based on the entire record before the Commission, (2) the order is without the Commission's jurisdiction, (3) the order violates state or federal law, or (4) the proceedings or manner in which the order was decided violated state or federal law to the prejudice of appellants. 220 ILCS 5/10-201(e)(iv)(A)-(D) (West 2022). The interpretation of a statute by the Commission is reviewed *de novo*. *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2016 IL App (3d) 150099, ¶ 35.

¶ 39    The Commission has general supervision of all public utilities. 220 ILCS 5/4-101 (West 2022). "Entities that are not public utilities are generally not subject to regulation under the Public Utilities Act or to supervision and control by the Commission." *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 32.

¶ 40    GridLiance argues that it cannot be a "public utility" because it does not provide direct utility services to end-use customers. We note that in *GridLiance*, Ill. Comm. Comm'n No. 18-

12

1617, GridLiance took the position that it was in the process of acquiring transmission assets to be used for public use. Although the request was withdrawn, GridLiance previously did not dispute that it was formed for the purpose of providing services for the public. GridLiance now interprets "public" to mean retail consumers of electricity, natural gas, or water. We disagree.

¶ 41    Section 3-105(a) defines "public utility" to mean and include:

> "every corporation, company, limited liability company, association, joint stock company or association, firm, partnership or individual, their lessees, trustees, or receivers appointed by any court whatsoever that owns, controls, operates or manages, within this State, directly or indirectly, for public use, any plant, equipment or property used or to be used for or in connection with, or owns or controls any franchise, license, permit or right to engage in:
>
>> (1) the production, storage, transmission, sale, delivery or furnishing of heat, cold, power, electricity, water, or light, except when used solely for communications purposes[.]" 220 ILCS 5/3-105(a)(1) (West 2022).

¶ 42    When interpreting a statute, the court's primary objective is to ascertain and give effect to the intent of the legislature, and the most reliable indicator of legislative intent is the language of the statute itself, which must be given its plain and ordinary meaning. *People ex rel. Madigan v. Wildermuth*, 2017 IL 120763, ¶ 17. "Words and phrases should not be construed in isolation but must be interpreted in light of other relevant provisions of the statute." *Wildermuth*, 2017 IL 120763, ¶ 17.

¶ 43    Section 3-105 defines "public utility" to include companies that own property used or to be used for or in connection with "the production, storage, transmission, sale, delivery or furnishing of *** electricity." 220 ILCS 5/3-105(a)(1) (West 2022). The plain language of section 3-105 does not restrict public utility status to entities that directly serve retail or end-use customers. The public use test is not whether a company owns assets dedicated to serving retail or end-use customers. The public use test is whether the company's assets are used for or in connection with

13

the provision of a utility to the public. An owner of transmission assets in Illinois may be considered a public utility under the Public Utilities Act based on the transmission of electricity.

¶ 44    There are two requirements for attaining public utility status: (1) a company must own, control, operate, or manage a plant, equipment, or property used or to be used for the production, transmission, or sale of utilities, directly or indirectly, within the state; and (2) it must offer those assets for public use. *Illinois Landowners Alliance*, 2017 IL 121302, ¶ 39.

¶ 45    GridLiance owns two substations in Joppa, Illinois, and six connecting 161 kilovolt transmission lines. GridLiance meets the first prong of the public utility test as it owns transmission assets in Illinois used for or in connection with the transmission of electricity.

¶ 46    We turn to the question of whether GridLiance's Illinois transmission assets are for public use. "[T]he term 'public utility' implies a public use, carrying with it the duty to serve the public and treat all persons alike, without discrimination, and it precludes the idea of service which is private in its nature, whether for the benefit and advantage of a few or of many." *State Public Utilities Comm'n v. Bethany Mutual Telephone Ass'n*, 270 Ill. 183, 186 (1915). The benefits do not need to be received by the whole public to make it a public use, but all persons must have an equal right to the use, and such use must not be confined to specific privileged persons. *State Public Utilities Comm'n v. Okaw Valley Mutual Telephone Ass'n*, 282 Ill. 336, 341 (1918).

¶ 47    GridLiance argues that the Commission's interim order is contrary to established Illinois precedent where the issue of whether an RTO's control over certain transmission assets rendered the assets' owner a public utility has already been determined. GridLiance relies on *Illinois Landowners Alliance*, 2016 IL App (3d) 150099, which held that a proposed transmission line was not for public use although 75% of the project's capacity would be distributed by the PJM Interconnection to members of its multistate transmission organization. *Illinois Landowners*

14

*Alliance*, 2016 IL App (3d) 150099, ¶ 46. However, in *Illinois Landowners Alliance*, 75% of the project's capacity would be sold to generators in the resource area of Iowa, South Dakota, Nebraska, and Minnesota. *Illinois Landowners Alliance*, 2016 IL App (3d) 150099, ¶ 46. The remaining 25% would be sold through an open season bidding project. *Illinois Landowners Alliance*, 2016 IL App (3d) 150099, ¶ 46. There was no way to know if an Illinois generator would submit a successful bid, and the project had not designated any part of the energy transmitted for public use in Illinois. *Illinois Landowners Alliance*, 2016 IL App (3d) 150099, ¶ 46.

¶ 48     In *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n*, a natural gas company sold gas to 23 industrial customers in Illinois. *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n*, 1 Ill. 2d 509, 519 (1953). The Illinois Supreme Court determined that Mississippi River Fuel was not a public utility where it never intended to assume the status of a public utility and had not established uniform rates. *Mississippi River Fuel Corp.*, 1 Ill. 2d at 515-16. Similarly, a water supply and distribution facility was not considered a public utility where it allowed 16 entities to connect and provided services at varied rates because it did not furnish water without discrimination and without delay. *Highland Dairy Farms Co. v. Helvetia Milk Condensing Co.*, 308 Ill. 294, 297-98, 301 (1923).

¶ 49     In comparison, in *Iowa RCO Ass'n v. Illinois Commerce Comm'n*, a pipeline company was found to be a public utility company where it sought to construct and operate a 200-mile-long pipeline from Illinois to Minnesota. *Iowa RCO Ass'n v. Illinois Commerce Comm'n*, 86 Ill. App. 3d 1116, 1117 (1980). The company was required under federal law to offer nondiscriminatory services to its nonaffiliated users and, therefore, estopped from denying that it was required to provide nondiscriminatory service under the Public Utilities Act. *Iowa RCO Ass'n*, 86 Ill. App. 3d at 1119.

15

¶ 50    GridLiance directly owns assets in Illinois, and MISO offers, under nondiscriminatory terms, usage pursuant to its MISO Tariff for the transmission of electricity to customers in Illinois. GridLiance has not held itself out to be a private company. FERC and GridLiance identified GridLiance as a public utility for federal purposes. Unlike *Mississippi River Fuel* and *Highland Dairy Farms*, GridLiance cannot choose who may take service over GridLiance's assets, or change rates, terms, and conditions. GridLiance is required to offer nondiscriminatory services to eligible customers in Illinois. Any customer that meets the definition of "eligible customer" receives services on the same terms, conditions, and rates. GridLiance meets both prongs and is a public utility under the Public Utilities Act.

¶ 51                                    B. *Res Judicata*

¶ 52    GridLiance argues that the prior owner of its transmission assets, EEI, was not found to be a public utility. See *Electric Energy, Inc. v. Illinois Commerce Comm'n*, No. 91-MR-175 (Cir. Ct. Sangamon County, Aug. 28, 1991). GridLiance claims that relitigating this issue is barred by *res judicata*.

¶ 53    "Under the doctrine of *res judicata*, a final judgment on the merits rendered by a court of competent jurisdiction acts as a bar to a subsequent suit between the parties involving the same cause of action." *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998). The issue of whether *res judicata* applies is an issue of law and reviewed *de novo*. *Arvia v. Madigan*, 209 Ill. 2d 520, 526 (2004). *Res judicata* does not apply to subsequent Commission decisions. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 407 (2010). The Commission has the power to freely address each situation regardless of whether the prior decision by the Commission was the same or similar. *Commonwealth Edison Co.*, 405 Ill. App. 3d at 407-08.

¶ 54 "*Res judicata* bars a subsequent action when three criteria are met: (1) there was a final judgment on the merits rendered by a court of competent jurisdiction; (2) there is an identity of cause of action; and (3) there is an identity of parties or their privies." *Downing v. Chicago Transit Authority*, 162 Ill. 2d 70, 73-74 (1994). Matters that could have been decided in that suit, as well as what was decided in the first action, are barred by *res judicata*. *River Park, Inc.*, 184 Ill. 2d at 302.

¶ 55 We first consider whether there was an identity of a cause of action. A transactional test is used to determine whether there is an identity of cause of action. *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 50. "Under the transactional test, the assertion of different theories or kinds of relief still constitute a single cause of action if a single group of operative facts gives rise to the assertion of relief." *Village of Bartonville*, 2017 IL 120643, ¶ 50. "If the same facts are essential to the maintenance of both proceedings or the same evidence is needed to sustain both, then there is identity between the allegedly different causes of action asserted and *res judicata* bars the latter action." (Internal quotation marks omitted.) *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 10.

¶ 56 The circuit court found in the *Electric Energy, Inc.* decision that EEI's transmission facilities were used solely to transmit power from the Joppa plant to the DOE Plant and to the Tennessee Valley Authority at the interconnection point at the DOE Plant, and to transmit power for EEI's sponsors. EEI's sponsors paid costs associated with the transmission assets.

¶ 57 After GridLiance acquired the transmission assets from EEI, it transferred functional control to MISO. GridLiance does not solely transmit power from the Joppa plant to the DOE Plant. According to Hackman's testimony, "the transfer renders the lines available as part of the broader transmission grid to move electricity within MISO's footprint, in an open access and nondiscriminatory manner" for public consumption. Because GridLiance transferred functional

17

control of transmission lines and associate facilities to MISO's functional control, there has been a material change in relevant facts and *res judicata* does not apply.

¶ 58 Moreover, GridLiance has not established that Ameren was a party or their privies in *Electric Energy, Inc. v. Illinois Commerce Comm'n*, No. 91-MR-175 (Cir. Ct. Sangamon County, Aug. 28, 1991). Privity exists between "parties who adequately represent the same legal interests." (Internal quotation marks omitted.) *People ex rel. Burris v. Progressive Land Developers, Inc.*, 151 Ill. 2d 285, 296 (1992). The nominal identity of the parties does not determine privity; it is the identity of interest that controls the determination. *Progressive Land Developers, Inc.*, 151 Ill. 2d at 296.

¶ 59 The *Electric Energy, Inc.* decision described EEI as investor owned. In 1991, Union Electric Company, Kentucky Utilities Company, Illinois Power Company, and Central Illinois Public Service Company had ownership shares in EEI. GridLiance argues that Ameren was effectively the plaintiff in *Electric Energy, Inc.* because three Ameren predecessors owned 80% of EEI at the time of the 1991 decision.

¶ 60 Ameren claims that it now has an interest in the costs that it and its customers pay after GridLiance acquired transmission assets and transferred functional control to MISO. Ameren's Illinois customers pay approximately $6 million a year for the maintenance and upgrades of the transmission assets. At the time of the 1991 *Electric Energy, Inc.* decision, Ameren, its customers, and other members of the public were not required to pay for the maintenance of the transmission assets. GridLiance has not shown that privity existed between Ameren and EEI where the interests of Ameren in this matter are not identical to the prior decision. *Res judicata* does not apply to the determination of whether GridLiance is a public utility.

18

¶ 61    The Commission did not err in its finding that GridLiance was a public utility. GridLiance is therefore subject to regulation under the Public Utilities Act and control by the Commission. The Commission, therefore, had the authority to order GridLiance to seek a CPCN and to reopen the proceeding to address the remaining allegations of Ameren's complaint.

¶ 62                                III. CONCLUSION

¶ 63    For the foregoing reasons, we affirm the interim order of the Illinois Commerce Commission.

¶ 64    Affirmed.

No. 5-23-0073

| | |
|---|---|
| **Cite as:** | *GridLiance Heartland LLC v. Illinois Commerce Comm'n, et al.*, 2023 IL App (5th) 230073 |
| **Decision Under Review:** | Appeal from the Illinois Commerce Commission, No. 20-0263 |
| **Attorney for Appellant:** | Phillip A. Casey, of Calfee, Halter & Griswold LLP, Indianapolis, IN, for appellant. |
| **Attorneys for Appellee:** | Anne M. Zehr, Albert D. Sturtevant, Mark W. DeMonte, Christine Prorok, Eric E. Dearmont, Matthew R. Tomc, of Whitt Sturtevant, LLP, of Chicago (for Ameren Illinois Company), Brian J. Dodds, Robert W. Funk, Thomas R. Stanton, Matthew L. Harvey of Illinois Commerce Commission of Chicago, (for Illinois Commerce Commission), for appellees. |